[Cite as *C4 Polymers, Inc. v. Huntington Natl. Bank*, 2015-Ohio-3475.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 102142**

---

## C4 POLYMERS, INC.

PLAINTIFF-APPELLEE

vs.

## HUNTINGTON NATIONAL BANK, ET AL.

DEFENDANTS-APPELLANTS

---

**JUDGMENT:**
AFFIRMED IN PART, REVERSED IN PART
AND REMANDED

---

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-12-790341

**BEFORE:** Jones, P.J., E.T. Gallagher, J., and Stewart, J.

**RELEASED AND JOURNALIZED:** August 27, 2015

**ATTORNEYS FOR APPELLANTS**

Janeane R. Cappara
Stephen M. Bales
Ziegler & Metzger, L.L.P.
925 Euclid Avenue
Suite 2020
Cleveland, Ohio 44115


**ATTORNEY FOR APPELLEE**

David M. Lynch
David M. Lynch, Attorney At Law
333 Babbitt Road
Suite 333
Euclid, Ohio 44123

LARRY A. JONES, SR., P.J.:

{¶1} Defendant-appellant Huntington National Bank filed this appeal after judgment was entered in favor of plaintiff-appellee C4 Polymers, Inc. The bank challenges the trial court's judgments: (1) reinstating the case to the active docket after it had dismissed it for C4 Polymers' discovery violation; (2) denying the bank's motions for summary judgment, a directed verdict, judgment notwithstanding the verdict ("JNOV"), and for a new trial; (3) entering judgment for C4 Polymers; and (4) awarding prejudgment interest in favor of C4 Polymers. We affirm in part, reverse in part, and remand.

## I. Procedural History

{¶2} This case stemmed from two unauthorized wire transfers, totaling approximately $50,000, from C4 Polymers' business account with Huntington Bank. The transactions occurred on December 24, 2008.

{¶3} In December 2010, C4 Polymers filed an action (Cuyahoga C.P. No. CV-10-744278) against Huntington Bank, asserting claims of negligence and breach of contract. In December 2011, the bank filed a motion to compel discovery responses. In January 2012, C4 Polymers dismissed the action.

{¶4} In August 2012, C4 Polymers filed this action, again asserting claims of negligence and breach of contract. The bank had the case removed to federal court in September 2012; it was returned to state court in January 2013.

{¶5} In April 2013, the bank filed a motion to compel discovery. After a conference on the motion, C4 Polymers agreed that it would respond to the bank's

discovery request on or before May 21, 2013. On May 22, 2013, upon notification from Huntington Bank that it had not received discovery from C4 Polymers, the trial court dismissed the case. The following day, May 23, 2013, C4 Polymers filed a notice stating that it had complied with the bank's discovery request. C4 Polymers also filed a motion to vacate the dismissal, which the trial court granted.

{¶6} In February 2014, the bank filed a motion for summary judgment, which was denied. The case proceeded to a jury trial with C4 Polymers solely pursuing the contract claim. At the conclusion of C4 Polymers' case, the bank requested a directed verdict, which was denied. After the bank rested its case, it renewed its request for a directed verdict, which was again denied.

{¶7} Prior to the case being submitted to the jury, the bank objected to the proposed jury instructions and requested that the trial court make a determination that the agreements at issue were "commercially reasonable" as a matter of law. The trial court agreed and found that the agreements were commercially reasonable as a matter of law. As a result, the court struck the portions of the jury instructions relative to the Uniform Commercial Code ("UCC") over the objection of C4 Polymers.

{¶8} The jury deliberated and responded to special interrogatories. Based on the responses, the trial court entered judgment in favor of C4 Polymers and against Huntington Bank in the amount of $49,470. The bank filed a motion for JNOV, or alternatively, for a new trial, and C4 Polymers filed a motion for prejudgment interest. The trial court denied the bank's motion; it granted C4 Polymers' motion for prejudgment

interest and awarded interest from December 24, 2008 (the date of the unauthorized transfers) through October 6, 2014 (the date of the court's judgment) in the amount of $10,546.

## II. Facts

{¶9} At the time in question, C4 Polymers, a small business in Bainbridge, Ohio, banked with Huntington Bank. The company used the online services provided by the bank, and three people at C4 Polymers were authorized to do so: (1) the company's founder and president, Eric Smith; (2) the company's chief financial officer, Jennifer Bayko; and (3) the company's controller, Barbara Rillahan. Smith rarely, if ever, used the online services; he delegated that responsibility mainly to Rillahan and secondarily to Bayko.

{¶10} The record demonstrates that on the day of Christmas Eve 2008 (a Wednesday), Bayko went to work in the morning; neither Smith nor Rillahan were at work in the office that day. Bayko testified that it was her main intention to check the mail and post any checks that may have come in. She logged into the company's online accounts with the bank by using her password, "token" code[1] and security code without incident, and began working on other tasks.

{¶11} By noontime, the mailman had not yet arrived, so Bayko decided she would check the accounts online and then leave. She had not signed out of the site from when

---

[1]A token password is a one-time password that changes in a matter of seconds. It is used as an extra measure of security.

she had previously signed in, and the site had logged her off, as was customary. Bayko therefore had to log on again; when she tried to log in to the online banking, however, she was unsuccessful. Thinking she had typed in wrong information, she tried another time to log in, but was again unsuccessful. She then left work to spend the holiday with her family.

{¶12} The company's controller, Rillahan, handled all of the company's accounts and it was her practice to check the accounts online even if she was out of the office. In line with her practice, the following day, on Christmas evening (a Thursday), Rillahan checked the company's accounts online and discovered that two wire transfers to Russia had been made from one of the company's accounts. The transfers alarmed Rillahan, and she called Bayko to inquire about them and learned that Bayko had not requested them. Rillahan then called the bank and reached a security guard who told her that there was not anybody in who could help her and she should call back in the morning at 7:00.

{¶13} Meanwhile, Bayko was also panicked, and called an information technology ("IT") person who the company worked with. The IT person told her to go to the company and take the network offline and contact the FBI; Bayko did both. The person with whom she spoke to at the FBI told her that who she needed to talk to was out of the office until the following week. Bayko also attempted to reach the firewall company that evening (Christmas), but was unsuccessful in talking to someone.

{¶14} The following day, December 26 (a Friday), Rillahan called the bank at 7:00 a.m. as she had been instructed. She reached someone who was not able to help her and

directed her to call back. Rillahan was eventually able to speak with Timothy Nichols, a vice president at Huntington Bank who Rillahan routinely worked with. After explaining the incident to Nichols, he told her that they would all "get together when everyone's back at the office." Rillahan testified that after speaking with Nichols, she "felt better" because she "didn't read anything in his voice that worried [her]."

{¶15} Smith, the founder and president of C4 Polymers, also called Nichols, who was Smith's contact person at the bank and with whom Smith had an "excellent relationship." Smith testified that Nichols told him "not to worry about it" because C4 Polymers had been such a "great" customer of Huntington Bank and the bank would, therefore, not "leave him hanging." Nichols also told Smith that the bank "had time to catch this." Smith testified that, although he was unnerved that someone had compromised the company's security, he "felt good knowing that [his] bank was going to stand behind [him]."

{¶16} In the days following the incident, Smith, Bayko, and Rillahan helped with the investigation into the matter. Smith testified that he called Nichols every day, and that within a short period of time, he detected Nichols's "attitude was changing." Meanwhile, Bayko had called the intermediary bank involved in the wire transfers, Chase Bank, and learned that something was completed incorrectly in the requests so the transfers did not "settle" until December 28. Bayko testified that both she and Rillahan brought this to Huntington Bank's attention, but Huntington never explained to them what occurred between the date of the requests on December 24 and the settle date of December

**{¶17}** Approximately one week after the incident, at Nichols's request, Smith, Bayko, and Rillahan met with Nichols. At that time, Nichols told them that he had the decision-making authority and had decided that the bank was not going to reimburse the funds because it believed the transfers were the fault of C4 Polymers.

**{¶18}** The record demonstrates that Huntington Bank had sent faxes to the company on December 24, of the "debit confirmations" regarding the wire transfers. However, the faxes came after Bayko had left for the day, and no other employees were at work.

**{¶19}** The record further demonstrates that, prior to the two successful transfers at issue here, other wire transfers not initiated by C4 Polymers had been attempted but were unsuccessful. The bank did not provide C4 Polymers with any notification of the attempted wire transfers. The bank also did not have a 24-hour fraud department. The bank did, however, offer the option of requiring "secondary approval" for wire transfers, but C4 Polymers declined the option.

**{¶20}** The investigation revealed that the successful transfer requests were tracked to an internet protocol ("IP") address in Pennsylvania. Bayko and Rillahan testified that they only sent wire requests from their work computers.

**{¶21}** The investigation also revealed that Bayko had had trouble with her work computer the day before the transfers (December 23). Specifically, she got a message that a "backdoor trojan horse threat" had been detected on her computer. In response to the message, she moved the threat to the "virus vault" and did a "rescan." No other

message showed up after that and she believed the threat had been eliminated.

**{¶22}** The next day, the day of the incident, Bayko got the message again, and again moved the threat to the "virus vault" and did a "rescan," after which it appeared the threat had been eliminated. The record reveals that when Bayko logged onto the online banking the day of the incident, the login screen looked like it normally did, with one exception: it required one extra field that normally was on another screen. According to Bayko, she "didn't think anything of it because Huntington is always changing their stuff around."

**{¶23}** Bayko also testified that the antivirus software the company used would occasionally give "false positives," in which case it was her practice to scan, and if nothing was detected in the scan, she would continue working on the computer. The company had used the software for approximately 13 years without incident and the program was routinely updated by the software company.

**{¶24}** Bayko testified that after the incident she did not use that computer anymore.[2] It sat in her office, unused, for approximately four-and-a-half years, until it was moved, due to renovations, to a closet. It was labeled "Jen's PC. Do not dispose of this." The bank requested the computer for analysis in 2013, and C4 Polymers complied. According to the bank's analyst, no virus was detected on the computer and it had last been used on April 28, 2008, months before the transfers at issue here.

---

[2]Bayko testified that she had to briefly turn it on on December 26, 2008, so that the bank could get a "screen shot" of the website she had logged onto.

## III. Assignments of Error

[I.] The trial court erred by denying appellant's motion for summary judgment, motion for directed verdict, renewed motion for directed verdict, and motion for judgment notwithstanding the verdict, or in the alternative, motion for new trial.

[II.] The trial court erred by submitting the matter to the jury after the trial court determined that appellant's online agreement and wire transfer agreements were commercially reasonable as a matter of law.

[III.] The trial court erred by denying Huntington's motion for judgment notwithstanding the verdict or motion for new trial.

[IV.] The trial court erred by denying Huntington's request for an instruction on spoliation of evidence.

[V.] The trial court erred by permitting appellee to show an inflammatory movie clip during closing argument.

[VI.] The trial court erred by reinstating the case after it was dismissed due the appellee's continued abuse of the discovery process.

[VII.] The trial court erred by granting appellee's motion for prejudgment interest.

## IV. Law and Analysis

**Motions for Summary Judgment and Directed Verdict**

{¶25} Summary judgment is a method available to a party seeking to avoid a trial and is used when the facts of a case are allegedly undisputed. *Parrish v. Jones*, 138 Ohio St.3d 23, 2013-Ohio-5224, 3 N.E.3d 155, ¶ 13. "A motion for summary judgment is based on evidence presented to the court and allows consideration of facts beyond the allegations included in the pleadings." *Id.* Civ.R. 56 governs summary judgment and provides as follows:

> Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. * * * A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor.

Civ.R. 56(C).

**{¶26}** We review an award of summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). We apply the same standard as the trial court, viewing the facts of the case in the light most favorable to the nonmoving party and resolving any doubt in favor of the nonmoving party. *Viock v. Stowe-Woodward Co.*, 13 Ohio App.3d 7, 12, 467 N.E.2d 1378 (6th Dist.1983).

**{¶27}** "Once a jury has been convened and trial has started, a party may no longer file a motion for * * * summary judgment. That time has passed. But a motion for directed verdict may be possible." *Parrish* at ¶ 14. Civ.R. 50(A) governs motions for directed verdict and reads in pertinent part as follows:

> (4) When granted on the evidence. When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.

Civ.R. 50(A)(4).

{¶28} A trial court's decision on a motion for directed verdict presents a question of law, which an appellate court reviews de novo. *Groob v. Keybank*, 108 Ohio St.3d 348, 2006-Ohio-1189, 843 N.E.2d 1170, ¶ 14. A directed verdict is appropriate where a plaintiff fails to present evidence from which reasonable minds could find in the plaintiff's favor. *Hargrove v. Tanner*, 66 Ohio App.3d 693, 695, 586 N.E.2d 141 (9th Dist.1990).

{¶29} Huntington Bank contends that the trial court erred in denying its motions for summary judgment and directed verdict because C4 Polymers "failed to establish any of the elements of a breach of contract claim." We disagree.

{¶30} In order to substantiate a breach of contract claim, a party must establish four elements: (1) a binding contract or agreement was formed; (2) the nonbreaching party performed its contractual obligations; (3) the other party failed to fulfill its contractual obligations without legal excuse; and (4) the nonbreaching party suffered damages as a result of the breach. *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App.3d 137, 144, 684 N.E.2d 1261 (9th Dist.1996), citing *Garofalo v. Chicago Title Ins. Co.*, 104 Ohio App.3d 95, 108, 661 N.E.2d 218 (8th Dist.1995).

{¶31} The documentation in the summary judgment exercise and the evidence at trial demonstrated that C4 Polymers and Huntington Bank had entered into two agreements that are relevant to this case: (1) a business online agreement, which was accepted and signed by Rillahan in May 2005, and (2) a wire transfer services agreement, which Smith entered into in January 2008. Both agreements contain provisions relating to security.

**{¶32}** The bank contends that it is not liable because it performed its contractual obligations, but that C4 Polymers breached its obligations by not keeping its login information secure.[3] The bank relies on several provisions contained in the agreements. Relative to the wire transfer agreement, the bank relies on the following provisions:

> Company [C4 Polymers] must establish and maintain procedures reasonably adapted to assure the confidentiality of Online Access, PINs, and Codes. Company agrees to be solely responsible for the security of Company's Online Access, PINs, and Codes. Wire transfer instructions received by Bank with Online Access, Codes, or PINs shall be deemed to be instructions received from an Authorized Representatives or Authorized Confirmation Representatives, and Bank is not liable for any transfer made if supplied with Online Access, PINs, or Codes, even if a person (i) authorized by Company exceeds his/her authority; (ii) does not have the authority of the company; (iii) has had his or her authority changed or revoked; or (iv) is not the same person as the Authorized Representative or Authorized Confirmation Representative. If Company believes that Online Access, PINS or Codes have become known by unauthorized persons (whether or not employed by the Company), Company must contact Bank immediately by telephone, and Bank will remove the Online Access, PINs, and/or Codes for Services, and issue new Online Access, PINs or Codes to Company in accordance with the Bank's security requirements.

**{¶33}** The wire transfer agreement further contained the following:

> Company is deemed to make a wire transfer request when the Bank receives the wire transfer request from the Company.
>
> * * *
>
> Bank will execute wire transfer requests with proper Online Access, PINs, Codes, or other information that Bank requires on the date received or the date(s) specified by the Company * * *.

---

[3]The security breach apparently occurred when Bayko failed to log out from the online banking website, and hackers were able to obtain her security information and recreate, almost exactly, the Huntington website.

**{¶34}** The wire transfer agreement also contained a "Limitation of Liability" provision, which provided that the bank would not be obligated to refund a company for a loss unless the bank was refunded from the drawee. The record here demonstrates that the bank was not able to recoup the funds.

**{¶35}** Relative to the business online agreement, the bank relies on a provision governing "Access Codes," which provides as follows:

Business [C4 Polymers] must establish and maintain procedures reasonably adapted to ensure the confidentiality of the Log-on Information and/or AU Logon Information.[4] Business agrees to be solely responsible for the security of Log-on Information and/or AU Log-on Information of Business. Transactions received by Bank with the Log-on Information or AU log-on Information shall be deemed to be authorized instructions received from a Master User or Authorized User. Bank is not responsible or liable for any loss or damages for any Transactions performed via Business Online if supplied with Log-on Information or AU Log-on Information. Furthermore, Business is liable for all Transactions made or authorized in Business Online with Log-on Information or AU Log-on Information, even if a person (i) authorized by Business exceeds his/her authority, (ii) does not have the authority of Business, (iii) has had his or her authority changed or

---

[4]In the agreement, "Log-on Information" refers to a password, and "AU Log-on Information" refers to a business identification password.

revoked, or (iv) is not the same person as the Master User or Authorized User.

{¶36} C4 Polymers, on the other hand, contends that the following language in the business online agreement created an issue of fact:

> Bank will use ordinary care in connection with processing Transactions initiated via Business Online. Bank's liability relating to any Transactions will be limited to actual proven damages sustained by Business arising directly from Bank's own gross negligence or willful misconduct.

{¶37} Upon consideration of the above-mentioned provisions, we find that the trial court did not err by denying the bank's motion for summary judgment or motion for a directed verdict. At the summary judgment stage, there were genuine issues of material fact as to whether the bank performed its contractual obligations and whether the company failed to fulfill its contractual obligations. There was also a genuine issue of material fact as to whether the bank used ordinary care in processing the transfer requests. Further, during the trial stage, the company presented evidence from which reasonable minds could find in its favor.

{¶38} We find the above based on the ambiguity presented in the two agreements. Specifically, under the wire transfer agreement Huntington was absolved of any liability if a wire transfer request was made with "proper online access, PINs, or codes." But under the business online agreement, the bank had to use "ordinary care" in processing transactions and could be liable for its "own gross negligence or willful misconduct." Where contract terms are ambiguous, their meanings are questions of fact. *Walter v. Agoston*, 12th Dist. Warren No. CA2003-03-039, 2004-Ohio-2488, ¶ 12. "Contract terms

are ambiguous where the language is susceptible to two or more reasonable interpretations." *Id.* This ambiguity created a genuine issue for the jury's consideration.

{¶39} In light of the above, the first assignment of error is overruled as it relates to the trial court's judgments denying the bank's motions for summary judgment and directed verdicts.

**Submitting Case to Jury**

{¶40} In its second assignment of error, Huntington contends that after the trial court determined that the agreements at issue were commercially reasonable, it "should not have submitted the matter to the jury because the issue of whether Huntington used ordinary care in processing the wire transfers was an issue of law that was already determined by the trial court." We disagree.

{¶41} Whether a contract is unfair and commercially unreasonable is a determination of whether a contract is unconscionable. Specifically, it is a determination of whether it is substantively unconscionable; substantive unconscionability refers to the actual terms of the agreement. *Porpora v. Gatliff Bldg. Co.*, 160 Ohio App.3d 843, 2005-Ohio-2410, 828 N.E.2d 1081, ¶ 8 (9th Dist.).[5] Unconscionability is a question of law. *Hurst v. Ent. Title Agency, Inc.,* 157 Ohio App.3d 133, 2004-Ohio-2307, 809 N.E.2d 689, ¶ 20 (11th Dist.). Courts determine questions of law. Juries determine whether, based on the law, there has been a violation.

---

[5]The other type of unconscionability is procedural unconscionability, which concerns the formation of the agreement and occurs when there was no voluntary meeting of the minds. *Porpora* at ¶ 7.

**{¶42}** Therefore, when the trial court determined that the agreements at issue here were commercially reasonable, it was only making a determination about the conscionability of the actual terms of the agreements; it was not a determination about whether those terms were breached. The determination of whether the terms of the agreements were breached was properly submitted to the jury.

**{¶43}** The second assignment of error is overruled.

**Motion for JNOV, or alternatively, New Trial**

**{¶44}** For its third assigned error, Huntington Bank contends that the trial court erred in denying its motion for JNOV, or alternatively, motion for a new trial. This issue is also raised in the first assignment of error.

**{¶45}** Review of a trial court's ruling on a motion for JNOV is de novo, because it presents a question of law. *Seese v. Admr., Bur. of Workers' Comp.*, 11th Dist. Trumbull No. 2009-T-0018, 2009-Ohio-6521, ¶ 11. The Ohio Supreme Court explained the trial court's task in ruling on a motion for JNOV made under Civ.R. 50(B) in *Posin v. A.B.C. Motor Court Hotel*, 45 Ohio St.2d 271, 344 N.E.2d 334 (1976):

> The test to be applied by a trial court in ruling on a motion for judgment notwithstanding the verdict is the same test to be applied on a motion for a directed verdict. The evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon either of the above motions.

(Citation omitted.) *Id.* at 275; *see also* Civ.R. 50(A)(4).

**{¶46}** Because the court does not weigh the evidence or evaluate the credibility of witnesses, "the court is confronted solely with a question of law: Was there sufficient material evidence presented at trial on this issue to create a factual question for the jury?" *Malone v. Courtyard by Marriott*, 74 Ohio St.3d 440, 445, 659 N.E.2d 1242 (1996).

**{¶47}** The bank contends that its motion for JNOV should have been granted because the "ordinary care" standard for banking in 2008 was not common knowledge and C4 Polymers failed to present expert testimony. This was not the ground the bank argued in the trial court for its motion for JNOV, or for that matter, for its motion for directed verdict; the lack of expert testimony was not raised at all at the trial court level. It is a cardinal rule of appellate procedure that "an appellate court will not consider any error which could have been brought to the trial court's attention, and hence avoided or otherwise corrected." *Schade v. Carnegie Body Co.*, 70 Ohio St.2d 207, 210, 436 N.E.2d 1001 (1982). Thus, a party waives and may not raise on appeal any error that arises during the trial court proceedings if that party fails to bring the error to the court's attention, by objection or otherwise, at a time when the trial court could avoid or correct the error. *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121-123, 679 N.E.2d 1099 (1997). A failure to object at trial waives all but plain error. *Id.* The plain error doctrine is applicable in civil cases only where the error "seriously affects the basic fairness, integrity, or public reputation of the judicial process." *Id.* at syllabus.

**{¶48}** If the lack of care is within the comprehension of a layperson, then no special or expert testimony is required. *Ramage v. Cent. Ohio Emp. Serv., Inc.* 64 Ohio St.3d 97,

102, 592 N.E.2d 828 (1992), citing Evid.R. 702 and 703. Upon review for plain error, we find that the standard of ordinary care in handling the transfer requests was within the comprehension of a layperson and, therefore, no expert testimony was required.

**{¶49}** Moreover, the trial court instructed the jury on ordinary care as follows:

Ordinary care means what a reasonably prudent person would do in the same or similar circumstance. And in this evaluation when you evaluate Huntington, you have to evaluate it from the perspective would other banks in a similar setting act prudently and do things in exercising ordinary care.

* * *

In evaluating the ordinary care that was or was not exercised relative to Huntington, you've got to compare them to what other banks would do. Did they exercise ordinary care? Did they act prudently under the circumstances in this case?

**{¶50}** In light of the above, we find that there was sufficient material evidence presented at the trial to create a factual issue for the jury's consideration. As discussed above, the agreements at issue were ambiguous: one absolved the bank of liability if a wire transfer request was made with "proper online access, PINs, or codes," while the other required the bank to use "ordinary care" in processing transactions and stated that the bank could be liable for its "own gross negligence or willful misconduct." Construing this ambiguity most strongly in favor of C4 Polymers, the trial court properly denied the bank's motion for JNOV.

**{¶51}** Alternatively, the bank sought a new trial. Although this court's review of the trial court's decision on the motion for JNOV is de novo, our review of its decision on the motion for a new trial is limited to determining whether the trial court abused its

discretion. *Thomas v. Columbia Sussex Corp.*, 10th Dist. Franklin No. 10AP-93, 2011-Ohio-17, ¶ 16. "It is well-settled law that the decision on a motion for a new trial pursuant to Civ.R. 59 is within the discretion of the trial court. The trial court's decision will be disturbed only upon a showing that such decision was unreasonable, unconscionable or arbitrary." *Sharp v. Norfolk & W. Ry. Co.*, 72 Ohio St.3d 307, 312, 649 N.E.2d 1219 (1995). Furthermore, in *Malone*, 74 Ohio St.3d 440, 659 N.E.2d 1242, the Supreme Court of Ohio stated:

> The abuse of discretion standard requires a reviewing court to "view the evidence favorably to the trial court's action rather than to the original jury's verdict." * * * This deference to a trial court's grant of a new trial stems in part from the recognition that the trial judge is better situated than a reviewing court to pass on questions of witness credibility and the "surrounding circumstances and atmosphere of the trial."

*Id.* at 448, quoting *Rohde v. Farmer*, 23 Ohio St.2d 82, 262 N.E.2d 685 (1970).

{¶52} Huntington Bank cited the following grounds, as set forth under Civ.R. 59(A), for a new trial:

> (4) Excessive or inadequate damages, appearing to have been given under the influence of passion or prejudice;
>
> * * *
>
> (6) The judgment is not sustained by the weight of the evidence; however, only one new trial may be granted on the weight of the evidence in the same case;
>
> (7) The judgment is contrary to law; [and]
>
> * * *
>
> (9) Error of law occurring at the trial and brought to the attention of the trial court by the party making the application.

**{¶53}** In regard to damages, the bank contends that the "jury * * * improperly awarded [C4 Polymers] damages on both wire transfers without indicating why it was improper for Huntington to execute the first wire transfer. As such, at a minimum, the jury's verdict is excess[ive] and Huntington is entitled to remitter." We disagree.

**{¶54}** The fifth jury interrogatory stated, "[i]f you find that the Defendant breached the contract, please state the nature of the breach." The jury, which in the third interrogatory found that Huntington breached the agreements, responded to the fifth interrogatory as follows: "Defendant did not use ordinary care in processing the 2 wire transactions made December 24, 2008[,] 5 seconds apart." This response demonstrates that the jury explained why it was improper for the bank to transfer the first wire request: it did not use ordinary care — for both requests. We therefore find that the trial court did not abuse its discretion by denying the bank's motion for a new trial on the ground of excessive damages.

**{¶55}** In regard to manifest weight, Huntington contends that under the terms of the agreements, it was required to execute the transfers. Within this context, the bank further contends that the jury's determination that the requests were made "5 seconds apart" was unsupported by the testimony, and even if it were true, it was inconsequential because there was no time limitation under the agreements for wire transfers.

**{¶56}** In regard to the bank's first contention, that it was obligated to process the transactions, the business online agreement, as already discussed, nonetheless required that transactions had to be processed with "ordinary care." The jury found that Huntington

did not use ordinary care, and we do not find the finding so incredible that a new trial must be ordered.

{¶57} In regard to the bank's second contention, that the jury's finding the transactions were executed "5 seconds apart" was unsupported by the testimony, we find that evidence in the record supported that finding. Specifically, the faxes that the bank sent to the company after the transfers indicated that they occurred five seconds apart. The jury, therefore, made a reasonable inference.

{¶58} The bank further contends, ostensibly in support of its contention that the jury's verdict was contrary to law, that the "evidence presented to the jury [was] legally insufficient to support the jury's verdict that Huntington fell below the standard of ordinary care" because the company "did not offer any evidence to explain how Huntington breached the standard of ordinary care." This argument goes to C4 Polymers' lack of expert, which we have already addressed and found was not fatal to the company's case.

{¶59} Huntington also contends that the jury's verdict was an error of law because this was a contract case and, therefore, the jury was not permitted to find liability on a negligence cause of action. According to the bank, the jury "incorrectly awarded damages based on its unsupported determination that Huntington failed to exercise ordinary care. The failure to use ordinary care does not rise to the level of gross negligence or willful misconduct." We disagree with the bank's contention.

{¶60} This provision wherein the bank was held to use "ordinary care" in

processing transactions and would be held liable for "gross negligence or willful misconduct" was in the contract written by the bank. C4 Polymers contended that the bank breached that contract provision and, therefore, was allowed to go forward on that contractual provision.

{¶61} In light of the above, the first and third assignments of error, as they relate to the trial court's denial of Huntington's motions for JNOV and a new trial, are overruled.

**Spoliation of Evidence**

{¶62} In Huntington's fourth assignment of error, the bank contends that the trial court erred by denying its request for a jury instruction on spoliation of evidence. According to the bank, C4 Polymers "spoiled" the computer at issue in this case.

{¶63} When instructing the jury, a trial court is required to provide a plain, distinct and unambiguous statement of the law applicable to the evidence. *Marshall v. Gibson*, 19 Ohio St.3d 10, 12, 482 N.E.2d 583 (1985). A jury instruction is proper when it (1) is relevant to the facts of the case; (2) gives a correct statement of the relevant law; and (3) is not covered in the general charge to the jury. *State v. Walker*, 8th Dist. Cuyahoga No. 97648, 2012-Ohio-4274, ¶ 53. We review a trial court's decision on jury instructions under an abuse of discretion standard. *State v. Leonard*, 8th Dist. Cuyahoga No. 98626, 2013-Ohio-1446, ¶ 33.

{¶64} A plaintiff is under a duty to preserve evidence that it knows or reasonably should know is relevant to the action. (Citations omitted.) *Cincinnati Ins. Co. v. Gen. Motors Corp.*, 6th Dist. Ottawa No. 94OT017, 1994 Ohio App. LEXIS 4960, *3 (Oct. 28,

1994). A defendant who is claiming that evidence was spoiled by the plaintiff must establish the following: (1) that the evidence is relevant, (2) that the plaintiff's expert had an opportunity to examine the unaltered evidence; and (3) that, even though the plaintiff was contemplating litigation against the defendant, the evidence was intentionally or negligently destroyed or altered without providing an opportunity for inspection by the defense. *Id.* at \*4.

{¶65} Huntington contends that "[a]fter numerous requests, [C4 Polymers] delivered what it claimed to be the computer infected by the virus for forensic analysis. [C4 Polymers'] counsel explained that the delay was due to his client's inability to find the computer." Upon examination of the computer, the bank's forensic analyst concluded that the computer was last accessed in April 2008, months before the December 2008 incident at issue. The bank, therefore, contends that C4 Polymers "failed to protect and preserve the computer that was infected by the virus."

{¶66} The witnesses for C4 Polymers testified that, after the incident, the computer at issue was only turned on once, on December 26, 2008, at Huntington's request so that it could get a "screen shot" of the website that Bayko had logged on to. After that, the computer remained in Bayko's office, unused, for approximately four-and-a-half years, at which point it was moved to a closet due to renovations being done in her office. Upon being moved to the closet, the computer was labeled "Jen's PC. Do not dispose of this." Both Bayko and Rillahan testified that they were "surprised" that it took until 2013 for the bank to request the computer.

{¶67} Although the record demonstrates that there were discovery violations by C4 Polymers (for which it was sanctioned), it does not show that the violations were relative to the computer. Further, the record demonstrates, as C4 Polymers contends, that in fact the bank did not request the computer until 2013.

{¶68} On this record, the trial court did not abuse its discretion in denying the bank's request for a spoliation instruction. There was no evidence that C4 Polymers intentionally or negligently destroyed or altered the computer without providing an opportunity for inspection by the bank.

{¶69} The fourth assignment of error is therefore overruled.

**Closing Argument**

{¶70} For its fifth assignment of error, the bank contends that the trial court erred in allowing C4 Polymers to play a scene from the movie Willy Wonka and the Chocolate Factory during closing argument. In the scene, the grandfather accused Willy Wonka of being a "crook, cheat and swindler" after Willy Wonka decided that he would not supply another character (Charlie) with a lifetime of chocolate because Charlie breached the terms of their agreement.

{¶71} As a general rule, "it is axiomatic that great latitude is afforded counsel in the presentation of closing argument to the jury." *Pang v. Minch*, 53 Ohio St.3d 186, 194, 559 N.E.2d 1313 (1990). Counsel is allowed wide latitude in presenting oral argument, although at all times counsel is subject to the supervision of the trial judge. *Yerrick v. E. Ohio Gas Co.*, 119 Ohio App. 220, 223, 198 N.E.2d 472 (9th Dist.1964). The assessment

of whether the bounds of permissible argument have been exceeded is, in the first instance, a discretionary function to be performed by the trial court. *Pang* at *id.*; *see also Jackson v. Booth Mem. Hosp.*, 47 Ohio App.3d 176, 180, 547 N.E.2d 1203 (8th Dist.1988). Thus, the trial court's determination of whether closing arguments are excessive will not be reversed absent an abuse of discretion. *Pang* at *id.* Huntington Bank did not object to the movie clip and, therefore, waived all but plain error. *Schroeder v. Parker*, 8th Dist. Cuyahoga No. 73907, 1998 Ohio App. LEXIS 5919, *9 (Dec. 10, 1998).

{¶72} Here, after informing the jury that the company was going to play a video, the court specifically instructed the jury as follows: "But it's not evidence, it's part of the closing arguments and I mentioned this before we broke last night[,] that anything you hear during the closing arguments will not constitute evidence. The evidence is closed. You've heard all the evidence." The court again instructed the jury before it began its deliberations that the "opening and closing arguments of counsel are designed to assist you. They do not constitute evidence. You are to consider only the evidence in this case."

{¶73} On this record, there was no plain error committed by allowing C4 Polymers to play the movie clip and the fifth assignment of error, therefore, is overruled.

**Reinstating the Case**

{¶74} In its sixth assignment of error, Huntington Bank contends that the trial court erred by reinstating the case after it dismissed it as a sanction for C4 Polymers' discovery violation.

**{¶75}** In order to reverse, we would have to find that the trial court abused its discretion in reinstating the case. "Abuse of discretion is a harsh term. An abuse of discretion involves a decision which is 'so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias.'" *Arrico v. Wessell Ent.*, 12th Dist. Butler Nos. CA85-10-115 and CA85-10-124, 1986 Ohio App. LEXIS 5208, *5 (Jan. 27, 1986), quoting *State v. Jenkins*, 15 Ohio St.3d 164, 222, 473 N.E.2d 264 (1984).

**{¶76}** In April 2013, the bank filed a motion to compel discovery. After a conference on the motion, C4 Polymers agreed that it would respond to the bank's discovery request on or before May 21, 2013. On May 22, 2013, upon notification from Huntington Bank that it had not received discovery from C4 Polymers, the trial court dismissed the case. The following day, May 23, 2013, C4 Polymers filed a notice stating that it had complied with the bank's discovery request. C4 Polymers also filed a motion to vacate the dismissal, which the trial court granted.

**{¶77}** On this record, the reinstatement did not cause a delay in the proceedings or prejudice to the bank. We, therefore, do not find an abuse of discretion. The sixth assignment of error is overruled.

**Prejudgment Interest**

**{¶78}** The bank contends in its final assignment of error that the trial court erred by granting C4 Polymers' motion for prejudgment interest. The bank cites the wire

transfer agreement in support of its contention that it

> does not have any obligation to reimburse [C4 Polymers] for the loss related to the theft of funds." Under the terms of that agreement, Huntington contends that it would only be liable for interest for a "period not exceeding thirty (30) days in situations where Huntington was in error — which is not the case here.

**{¶79}** Huntington further contends that the trial court had broad discretion in determining the start and end dates for the accrual of the prejudgment interest, and that it abused its discretion in its determination that it would start on December 24, 2008 and continue through the date the court awarded interest. Specifically, the bank contends that these dates are "particularly unsupportable" because C4 Polymers' conduct caused delay.

**{¶80}** The bank cites the following in support of its contention: (1) the first action was not filed until nearly two years after the incident; (2) C4 Polymers was not timely in responding to the bank's discovery requests in the first case and resulted in the company dismissing the case in January 2012; (3) the second case (this case) was refiled in August 2012; (4) this case was dismissed because of C4 Polymers' discovery violation in May 2013; it was reinstated in July 2013; and (5) in October 2013, the bank had to file another motion to compel C4 Polymers to respond to discovery.

**{¶81}** C4 Polymers, on the other hand, contends that, in contract cases, "prejudgment interest is mandatory and must be calculated from the date of the contract violation until the date of calculation of the amount of the award." The company relies on this court's decision in *Norco Equip. Co. v. Simtrex, Inc.*, 8th Dist. Cuyahoga No. 95914, 2011-Ohio-3688, in support of its contention.

**{¶82}** Prejudgment interest in a contract claim compensates the plaintiff for the time between the accrual of the claim and the judgment. *Local Marketing Corp. v. Prudential Ins. Co. of Am.*, 159 Ohio App.3d 410, 2004-Ohio-7001, 824 N.E.2d 122, ¶ 15 (1st Dist.), citing *J. Richard Indus., LP, v. Stanley Machining, Inc.*, 6th Dist. Lucas No. L-03-1024, 2004-Ohio-3804. R.C. 1343.03(A) governs the accrual of interest in a breach of contract claim and provides that when money becomes due and payable on a judgment "arising out of * * * a contract or other transaction, the creditor is entitled to interest at the rate per annum determined pursuant to section 5703.47 of the Revised Code * * *." Thus, it is true, as C4 Polymers contends, that when a party has been granted judgment on a contract claim, prejudgment interest on the judgment is mandatory. *Reminger & Reminger Co., L.P.A. v. Fred Siegel Co.*, 8th Dist. Cuyahoga No. 77712, 2001 Ohio App. LEXIS 760, *24-*25 (Mar. 1, 2001).

**{¶83}** But it is not true, as C4 Polymers contends, that the interest "must be calculated from the date of the contract violation until the date of calculation of the amount of the award." *Norco*, relied on by C4 Polymers, makes it clear that the trial court has discretion in determining the accrual date:

> Although the right to prejudgment interest under R.C. 1343.03(A) is nondiscretionary, the trial court has discretion to determine when the money became "due and payable" and the aggrieved party should be compensated for the lapse of time between the accrual of the claim and judgment. Thus, while the right to prejudgment interest in a contract claim is a matter of law, the amount awarded is based on the court's factual determination of an accrual date.

*Id.* at ¶ 11, citing *Royal Elec. Constr. Corp. v. Ohio State Univ.*, 73 Ohio St.3d 110,

115-116, 652 N.E.2d 687, (1995).

{¶84} Upon review, we disagree with Huntington's position that under the agreements it could only be responsible for interest for 30 days; instead, we find that R.C. 1343.03(A) governs and under that section, as mentioned, the trial court had discretion to determine the accrual of interest. We do, however, find that the trial court abused its discretion in ordering interest from December 24, 2008 through the date of its award of prejudgment interest. There were times that the delay in this case was occasioned by C4 Polymers and, therefore, it was unreasonable to charge that against the bank. The judgment awarding prejudgment interest from December 24, 2008 through the date of the court's award of the interest is, therefore, reversed. The case is remanded for the trial court to hold a hearing to determine what times should not be counted against Huntington, and then to recalculate the interest.

{¶85} The seventh assignment of error is sustained.

## V. Conclusion

{¶86} The verdict in favor of C4 Polymers is affirmed. However, the trial court abused its discretion in its calculation of prejudgment interest. The judgment awarding $10,546 in prejudgment interest is, therefore, reversed as it relates to the dates for calculating it, and the case is remanded to the trial court for a hearing on prejudgment interest and for the recalculation of same.

{¶87} Affirmed in part; reversed in part; case remanded.

It is ordered that appellants and appellee split the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

_____

LARRY A. JONES, SR., PRESIDING JUDGE

EILEEN T. GALLAGHER, J., CONCURS;
MELODY J. STEWART, J., DISSENTS WITH
SEPARATE OPINION


MELODY J. STEWART, J., DISSENTING:

**{¶88}** I respectfully submit that this case should never have been submitted to a jury — the court should have directed a verdict in Huntington's favor because Huntington disclaimed liability for wire transfers made using valid online access and PIN codes, and C4 Polymers made no showing of any kind that Huntington failed to exercise ordinary care in how it processed the online transaction.

**{¶89}** The wire transfer agreement at issue in this case contains a disclaimer of liability that unambiguously states that the security of the login and passwords is C4 Polymers' responsibility, that C4 Polymers will be liable for any wire transfer that is ordered using proper login and password information even if used by an unauthorized person, and that if a proper login and password is used in the online banking system, the

bank will execute a wire transfer if received by the bank on a non-bank holiday and within the established deadline.    There is no dispute that hackers, by way of a virus implanted on a C4 Polymers' computer, were able to steal C4 Polymers' login and password information; that the login and password were valid for entry into Huntington's online banking system; and that having been supplied a valid login and password, Huntington made the wire transfer on December 24, 2008, as requested.    Huntington's disclaimer barred liability for this fraudulent act.

{¶90} C4 Polymers raised two theories of liability based on Huntington's agreement to use "ordinary care" in processing online banking transaction:    first, that Huntington failed to recognize that the wire transfers were made from IP addresses that were different from the one normally used by C4 Polymers; second, that Huntington should have had a mechanism for addressing customer issues on bank holidays like Christmas.

{¶91} C4 Polymers offered no expert testimony to show that Huntington did not exercise ordinary care in the manner in which it executed the wire transfer.    Its only witnesses were three of its own employees, none of whom were qualified in any way to state an opinion on what a reasonable bank should have done under the circumstances. Ohio adheres to the rule that when professional negligence is alleged, expert testimony is generally required to establish the duty of care.    *Staph v. Sheldon*, 8th Dist. Cuyahoga No. 91619, 2009-Ohio-122, ¶ 18.

{¶92} The majority concludes that Huntington waived the issue of expert testimony by failing to raise it as a basis for a directed verdict, but the duty of care was an essential

element of C4 Polymers' claim. C4 Polymers was obligated to prove the relevant standard of care at the intersection of commercial online banking and the world of computer hacking. That required an expert opinion. Yet C4 Polymers offered no evidence of any kind to show what steps Huntington might have taken or even why Huntington should have caught the hackers when C4 Polymers' own software did not. This latter point is important because the evidence was clear that C4 Polymers knew that its computer had been infected by a virus before the online transactions at issue in this case occurred — in fact, it knew that something was wrong with the computer several days before the hack. The severity of the hack was compounded by C4 Polymers rejecting an added layer of online banking protection (or "secondary approval") that would have required Huntington to confirm wire transfers in excess of a specified dollar amount. The failure to show the duty of care required of Huntington under the circumstances meant that C4 Polymers could not, as a matter of law, present a case sufficient to send to a jury.

{¶93} Finally, the visiting judge assigned to preside over the trial denied Huntington's motion for a directed verdict on grounds that the trial judge had denied summary judgment, as though that were somehow dispositive of the directed verdict motion. Obviously, the ruling on the motion for a directed verdict had to be based on the evidence produced at trial — the evidence offered in motion practice before trial was irrelevant. As detailed, the evidence offered by C4 Polymers did not establish the relevant duty of care. As a matter of law, the court should have directed a verdict in

Huntington's favor.   For these reasons, I respectfully dissent.