[Cite as *McCoy v. Avon Place Skilled Nursing & Rehab. Ctr.*, 2026-Ohio-36.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

KAREN P. MCCOY, ADMINISTRATOR
OF THE ESTATE OF MARIANNE
VICTORIA ANDREWS, DECEASED,
AND KAREN P. MCCOY,
INDIVIDUALLY,                                       :

      Plaintiff-Appellee,                      :

                                        No. 114779

      v.                                       :

AVON PLACE SKILLED NURSING
AND REHABILITATION CENTER,
ET AL.,                                             :

      Defendants-Appellants.                   :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** January 8, 2026

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-21-950678

---

### *Appearances:*

Dworken & Bernstein Co., L.P.A., Patrick T. Murphy,
Christian D. Foisy, and Patrick J. Perotti, *for appellee.*

Rolf Martin Lang LLP, and Joseph F. Petros III, and
Brendan M. Richard, *for appellants.*

MARY J. BOYLE, J.:

{¶ 1} Defendants-appellants Avon Place Skilled Nursing and Rehabilitation Center, Foundations Health Solutions, LLC, and Cardinal Avon, Inc. (collectively "Avon Place") appeal from the jury trial in which a verdict was rendered in favor of plaintiffs-appellees Karen McCoy ("McCoy"), individually and as administrator, and the Estate of Marianne Andrews ("Estate" or "Andrews") (collectively "Plaintiffs") in this nursing-home negligence, wrongful-death, and negligent-infliction-of-emotional-distress action against Avon Place. Based upon the jury's verdict and the application of the statutory damages cap, the total judgment entered by the trial court against Avon Place amounted to $3,461,349.73. Additionally, Plaintiffs were awarded $1,900,000 in prejudgment interest and postjudgment interest at the statutory rate. Avon Place does not challenge liability, but rather challenges: (1) the punitive-damages award, which it contends exceeded what is permissible under Ohio law; (2) the trial court's application of noneconomic compensatory damages to each of the Estate's survivorship claims; (3) the court's award of attorney fees and expenses; and (4) the court's award of prejudgment interest. For the reasons set forth below, we affirm.

## I. Facts and Procedural History

{¶ 2} Relevant to this appeal, Plaintiffs filed a complaint against Avon Place in July 2021. The complaint alleged claims for (1) survivorship by the Estate for the pain and suffering of Andrews; (2) the wrongful death of Andrews; (3) violations of

Andrews's statutory rights as a nursing home resident under Ohio's Nursing Home Residents' Bill of Rights ("NHRBR"); (4) negligent infliction of emotional distress to McCoy, and (5) corporate liability for Avon Place's "acts resulting in an understaffed and undercapitalized facility throughout [Andrews's] residency, [Andrews suffering] from cardiopulmonary arrest and [being severely injured] which led to her medical decline and death." (Complaint, July 30, 2021.) The complaint also sought punitive damages, alleging that the conduct of Avon Place "was malicious in that it demonstrated a conscious disregard for the rights and safety of the residents and visitors of [Avon Place], including [Andrews and McCoy], and had a great probability of causing substantial harm[.]" (Complaint, July 30, 2021.)

{¶ 3} After conducting extensive discovery, the parties engaged in two mediations — one in May 2023 and another in October 2023. The parties were unable to arrive at a settlement.[1] The matter then proceeded to trial, which was bifurcated as to compensatory damages and punitive damages. The following evidence was adduced at trial.

{¶ 4} In March 2020, Andrews started having pain in her abdomen, which resulted in the removal of her gallbladder. She was intubated during the surgery to assist with breathing and extubated afterwards. Within a couple of days, however, she started to have trouble breathing and had to be reintubated. Andrews was transferred from the hospital to long-term acute facility care. The goal of the long-

---

[1] We note that mediation proceedings are privileged and the exact nature of the discussions held are subject to that privilege unless it is waived or precluded as set forth in R.C. 2710.04. R.C. 2710.03.

term facility "was to have her recover from the trach and to get her off of the ventilation, the mechanical ventilation, to allow her to breathe on her own." (Tr. 258.) After the long-term care facility, Andrews's family decided to do home health care.[2] Andrews was in home health care for approximately a month from May to June 2020. One day while at home, Andrews had trouble breathing and was admitted to the hospital. From there, Andrews was admitted on June 18, 2020, as a rehabilitation patient at Avon Place where she was treated for respiratory insufficiency.

{¶ 5} Andrews was 87 years old at the time she was admitted and was receiving oxygen through a tracheostomy tube. The goal for Andrews was to maintain airway patency without respiratory complications. Because Andrews's admittance was during the height of the COVID pandemic, Avon Place only permitted family visits through the window from outside the patient's room. Andrews's daughter, McCoy, testified that "we could hear each other through the windows." (Tr. 656.)

{¶ 6} On August 1, 2020, McCoy visited her mother at Avon Place. When she arrived at the outside of the window of Andrews's room, she observed Avon Place Licensed Practical Nurse Onieda Marrero ("Marrero") open the window blinds. Andrews was laying in her bed, which was angled so that she was in an upright position. McCoy immediately noticed Andrews's color and that there was a "big wad

---

[2] Andrews had nine children, one of which is deceased.

of gauze in her neck." (Tr. 646.)  McCoy testified that when she asked Marrero, "[W]hat's going on?  What's with the rags[?]" Marrero turned and walked away. (Tr. 646.)  At that point in time, she started to record with her cell phone camera because she "took a lot of pictures of [Andrews].  Always." (Tr. 647.)  McCoy also attempted to contact her sisters to determine what course of action to take because Andrews was "chest breathing and going into distress." (Tr. 647.)  McCoy testified that she "saw her [mother] slow down and then [she] saw the color go out of her." (Tr. 651.)

{¶ 7} McCoy testified that Avon Place Respiratory Therapist Brian Baum ("Brian") then walked into the room.  He started to work on Andrews, but McCoy knew Andrews needed more immediate help.  McCoy hit the window and said, "Brian, she's dead.  And he still — he looked [at McCoy] and [McCoy] go[es], she's dead, and [McCoy] hit the window again.  And he still just was like oblivious to it. [McCoy] couldn't believe it." (Tr. 651.)  Marrero then came into the room and closed the blinds.  The paramedics arrived and transported Andrews to the hospital. McCoy testified that she followed them.  The medical staff attempted to work on Andrews but ultimately told McCoy that Andrews was "brain dead." (Tr. 654.)

{¶ 8} Although liability is not at issue, we find it necessary to include relevant testimony from McCoy's cell phone videos, which were played for the jury, and Plaintiffs' experts in order address the assigned errors raised.  The cell phone videos depict Andrews kicking her feet and gasping for air.  In the videos, McCoy can be heard hitting the window, stating that "it looks like [Andrews's] color is blue." Referring to the wad of gauze on Andrews's neck, McCoy can then be heard stating,

"I don't understand what that is on her neck.  She's breathing hard, seems like she's gasping trying to get air."  (Plaintiff's exhibit No. 15-c.)  McCoy can also be heard stating, "I'm shaking so hard, cause I don't know what to do. . . .  They need to get that thing uncovered . . . it's covering up [Andrews's] trach . . . and she's gasping for air."  (Plaintiff's exhibit No. 15-e.)

{¶ 9} Plaintiffs' expert, Dr. John Schweiger, M.D., ("Dr. Schweiger") testified that

> Andrews's oxygen condenser/humidifier was to the left of the bed, meaning it was towards the left of her head on the night stand in the room.  It appeared in looking at the videos that when the bed was turned 45 degrees towards the window, the night stand was not moved.  And what this resulted in is that the corrugated tubing that is coming up underneath her left under arm[.]. . . [B]y not moving the night stand when the bed is moved, it's going to put traction, meaning [you're] pulling on the corrugated tubing and you can see that the trach collar rather than sitting directly on top of the opening of the trach has been pulled down on her chest so that it's closer to the top of her breast bone, which means that the oxygen is not being delivered to the opening of the tracheostomy because it's flowing into her chest cavity.
>
> . . .
>
> We routinely educate our nurses and respiratory therapists not to position the tubing under the arm because, again, when you get traction, it's going to pull the trach collar away from the tracheostomy and that's going to result in displacement.
>
> Also one can see in looking at the picture that there's a collection of . . . bunched up gauzes around the tracheostomy only itself. . . .  But you [do not] want to put a big bunched up wad of gauze there because it can dislodge the positioning of the trach and you never want to position it so the gauze can cover the trach because if doing that, it will create a flat on top blocking the air from coming in and the oxygen and also blocking the oxygen air from coming out.
>
> So in looking at the picture, it looks like there's either a partial or complete occlusion to the opening of the tracheostomy plus

simultaneously displacement of the tubing and a trach collar which would prevent adequate oxygen supplementation to be delivered to her lung.

(Tr. 538-540.)

{¶ 10} Dr. Schweiger opined, within a reasonable degree of medical certainty, that if

Marrero was in the room opening up the window and then left at the onset of the visit, that [would] be a violation of the standard of care because simple surveillance, meaning observing the patient, would reveal, number one, that the trach is occluded so you would immediately remove the gauze. You would not walk out of the room while leaving the gauze over the tracheostomy. And, number two, knowing that the patient had been depend[e]nt on supplemental oxygen for weeks, you would make sure that the trach collar was appropriately positioned so that the supplemental oxygen would be going into her lung, and one would see that the tubing was under her left underarm so all three of those should be immediately corrected before the healthcare worker leaves the patient's bedside.

(Tr. 542.)

{¶ 11} The videos then depict Brian entering Andrews's room. Brian was not aware that this was an emergency situation when he entered the room because he came in to give Andrews a breathing treatment. The video depicts him disconnecting the trach collar. He removed the gauze in an attempt to stimulate Andrews. He then took her pulse. He yells out "faint pulse." (Tr. 546.) Brian can be observed retrieving a medical device used for suctioning. McCoy can be heard stating, "[T]hat thing was blocked on her neck. I tried tell [Marrero] and she walked away from me. She walked away, that was blocking her throat." (Plaintiffs' exhibit No. 15-f.) Brian calls for Marrero to reenter the room. Brian retrieves an "ambu bag," which "provides the ability to have artificial ventilation by squeezing the bag

and blowing oxygen into the patient's tracheostomy." (Tr. 551.) Marrero can be observed attempting to stimulate Andrews unsuccessfully. EMS was then called and arrived on the scene.

{¶ 12} With regard to Brian's actions that day, Dr. Schweiger opined, within a reasonable degree of medical certainty, that Brian "did deviate from the applicable standard of care in terms of his initial evaluation and attempts at resuscitation on the midday of August 1st of 2020." (Tr. 558.) Dr. Schweiger testified upon entering the room and seeing Andrews's inadequate respiration and ventilation, Brian

> should have immediately assessed the patency of the tracheostomy, meaning rip the gauze off, felt for a central pulse next to the tracheostomy in the carotid, so you can look at the chest, you can look at the trach, feel for the carotid, immediately then got flexible suction to suction the inside of the tracheostomy out or quickly remove the cannula and replace it. Then provide several high quality breaths to the patient with 100 percent oxygen to renourish her lungs and her body with oxygen.

> In the absence of that, put the backboard in. Of course, immediately call for help so that [Marrero] or any of the other providers could have dialed 911.

(Tr. 559.)

{¶ 13} When asked by Plaintiffs' counsel for Dr. Schweiger's opinion as to what caused Andrews's respiratory failure or cardiac arrest and ultimate death, the doctor replied:

> I have formed an opinion within a reasonable degree of medical certainty [and] . . . in [Andrews's] case, the ultimate cascade is what is described as multi-factorial, meaning there were two or more sequences in the event, and I'll quickly walk you through that.

> Initially what started this whole process around 11:55 [a.m.] on August 1st, 2020, was what's known as acute . . . chronic respiratory failure.

There was, more likely than not, a mucus plug that formed inside her body either around the end of the tracheotomy or inside the tracheotomy that resulted in partial obstruction. That then coupled with the gauze that was laying over the top of it provided additional obstruction. So there's internal mucus and the gauze overlaying. That resulted in a marked increase in the patient's work of breathing, which having been debilitated and been sick for many months rapidly resulted in her struggling.

In the first video, we see her kicking her legs and trying to move around, almost is air hungry or can't catch their breath. Then she developed hypoxemia, which is a fancy medical word that simply means low oxygen in her blood. As she was having trouble getting her oxygen from the environment, she also had the trach collar pulled away. So routinely at six liters of oxygen through the trach collar, the patient would be getting between 40 and 45 percent oxygen with each breath. With that being removed, now she's at room air, which is 21 percent oxygen.

So with her reduction in oxygen and the increased work of breathing, it then resulted in a very rapid buildup in her blood of carbon dioxide, and I know that because when the paramedics arrived, they put a monitor on her and it showed that her end title carbon dioxide, that you or I in this courtroom would be 40, that's what we live from the time we come out of our mother's womb until the time we go to heaven, it's 40. Hers was 80.

So she had doubled the amount of carbon dioxide when the paramedics began to breathe for her. And that means because she stored up all this carbon dioxide in her body, she couldn't get it out. So that's called acute respiratory failure with respiratory acidosis, low oxygen, high carbon dioxide. When you get that combination, it alters the chemistry in your blood, making the blood more and more acidic. The heart muscle itself and the receptors require a normal pH of 7.40. . . .

When you have low oxygen and high $CO_2$, you shift it way to the acid side. That then causes the heart to sputter, have a harder time contracting, have a harder time pumping what little blood it can get out, but now the blood itself is devoid of oxygen, which is the fuel that runs the engine of the heart.

So it's almost like if you started your car up and you had no gas in the gas tank. It doesn't matter if you have a sports car or an old junker, you're not going anywhere. There's no fuel in the gas tank.

For [Andrews], her fuel was the oxygen. It was exhausted. That then led to pulseless electrical activity, which was seen by the paramedics, meaning her heart was still sending electrical messages, but there was no energy for her to contract the heart muscle, and as a result of that, she didn't pump blood to her brain, which is why in the emergency room once they resuscitate her, she started actively seizing and having myoclonic activity. She was twitching because by that point, there was brain injury, what we describe in medicine as hypoxic ischemic encephalopathy.

And so that was the sequence from beginning to the end that then resulted to the point that once their critical care doctor . . . arrived in the emergency room to evaluate her, he basically concluded at that point, she would not eventually survive or at the very best be left with permanent brain injury. Thus the family then agreed to make her do not resuscitate, comfort care, and she was moved to inpatient hospice where she died that night.

(Tr. 563-567.)

{¶ 14} Dr. Schweiger further opined that if

Marrero at the onset recognized that the gauze was covering the opening of the tracheostomy and immediately removed it or repositioned it, noticed that the corrugated tubing attached to the oxygen trach collar was malpositioned, taking it out from underneath her arm and appropriately position the mask, and if need be, call [Brian] into the room to either provide suctioning or the breathing treatment he was going to do five minutes later, then more likely than not, none of this would have happened to [Andrews] on that day.

(Tr. 570.) And as to Brian, Dr. Schweiger opined that he contributed to Andrews's death because of the delay in "recognizing the distress that [Andrews] was in," "wasting time with this nonsensical suctioning of her chest wall of the mucus, which would do nothing," and "the failure to immediately call [Marrero], have them activate EMS to bring help to the skilled nursing facility, and either suction the trach or remove the inner cannula and provide high quality oxygen and ventilation to the patient, was a cause in a contributing factor to the eventual pulseless electrical

activity and the cardiac arrest within the subsequent damage that was identified in the emergency department." (Tr. 571.)

{¶ 15} Plaintiffs' nursing expert, Kathleen Hill-O'Neill testified that, in her opinion, the Avon Place staff

> failed to adequately provide care to [Andrews] to maintain her safety and her well-being. Specifically, she, per the videos that I have reviewed, was in her bed. One of the reasons she's there is because she's trach[ed.] So she cannot maintain oxygen levels like we can when we breathe. She has to have a trach collar to a trach, which is that hole in her neck, and ostomy and a breathing tube. It's the most critical thing that they're caring [for] her. So it's really important every time they're in that room, whenever they're obviously going to leave her, to make sure that all that is set up properly.
>
> . . .
>
> In addition to that, you're looking right at that airway. Remember her life depends on this trach, depends on it. We have to not only make sure the oxygen is connected properly, we have to make sure there's no occlusion there. So there's a gauze dressing that goes around the site under the tube, has a little slit in it and it goes right here.
>
> The tube, the airway, should never been covered, blocked in any way. So you would not want to leave this patient with any obstruction like that gauze being misplaced and over her trach.

(Tr. 476-477.)

{¶ 16} Marrero testified for Avon Place. According to Marrero, Andrews could not do much for herself and was fed through a tube. On August 1, Marrero set up Andrews for the window visit with McCoy by turning Andrews's bed to face towards the window. After setting up Andrews for the visit, Marrero made sure that Andrews was breathing and her breathing equipment was properly positioned and functioning. Marrero testified that during these window visits, she was able to

communicate with the family through the window. Marrero explained, "It wasn't like you could hear everything. If I didn't hear, I would say I can't hear you. But for the most part, you could hear them basically[.]" (Tr. 345.)

{¶ 17} Marrero further testified that she reentered the room when Brian called for her. They worked on Andrews until the EMS arrived. Marrero reported to EMS that Andrews "was down for about five minutes of time" and that Andrews was "full code," which meant that they did "complete CPR." (Tr. 353.) Marrero also reported that "the family noticed patient not breathing through the window as they were approaching for a visit." (Tr. 353.) According to Marrero, she has been disciplined in the past for making mistakes on patient's charts. Marrero testified, "Yeah, I made mistakes before." (Tr. 352.)

{¶ 18} Brian testified that he entered the room to do an aerosol treatment on August 1. When he turned the bed to administer the treatment, he observed that Andrews was unresponsive. According to Brian, he removed the oxygen mask and could observe that gauze was partially obstructing Andrews's airway. Brian testified that he took Andrews's pulse and tried to arouse her. At this point, Brian realized that Andrews was in respiratory failure. Brian further testified that he started to suction mucus off her chest and around the airway in preparation for chest compressions and then called for Marrero.

{¶ 19} With regard to Andrews's NHRBR claim, McCoy's sister, Pattie Ferrari ("Pattie"), testified to an incident with their mother that occurred on July 23, 2020. Ferrari had a window visit scheduled with Andrews that day. According to Ferrari,

upon her arrival, she discovered Andrews sitting slumped over in a chair. Ferrari took pictures of Andrews, which were shown to the jury. (Plaintiffs' exhibits Nos. 21 and 22.) Ferrari testified that she called Brian and the front desk and attempted for an hour and a half to get Andrews help. When the Avon Place staff finally came into the room, they put Andrews in bed and closed the window blinds. The visit ended at that time. Nurse O'Neill testified, within a reasonable degree of medical certainty, that leaving someone with a tracheostomy in this position and for that length of time does not meet the standard of care for the resident's rights.

{¶ 20} Following the conclusion of the compensatory damages portion of the trial, the jury returned a verdict in favor of the Plaintiffs on November 17, 2023. The jury awarded compensatory damages for wrongful death in the amount of $1,150,000; survivorship damages for pain and suffering relating to the events on August 1 in the amount of $300,000; survivorship damages for pre-August 1 violation of Andrews's rights under the NHRBR in the amount of $500,000; and damages for negligent infliction of emotional distress to McCoy in the amount of $350,000, for a total of $2,300,000.

{¶ 21} The jury reconvened on November 27, 2023, to determine punitive damages. The trial court submitted interrogatories to the jury indicating that they could award punitive damages to the Plaintiffs based on a finding of malicious conduct by "an employee of the defendant." The jury subsequently returned a verdict awarding the Plaintiffs $500,000 in punitive damages and "a reasonable

amount in attorney fees" to be later determined by the trial court. (Judgment Entry, Dec. 7, 2023.)

{¶ 22} The parties then engaged in post-verdict briefing. In December 2023, Plaintiffs filed a motion for prejudgment interest requesting that the trial court award prejudgment interest because Avon Place did not make a "good faith effort" to settle the case.[3] Additionally, Plaintiffs filed a motion for judgment with the statutory caps applied. Plaintiffs conceded that the damages awarded on: (1) the survivorship claim for pain and suffering relating to the events on August 1; (2) the pre-August 1 violations of Andrews's rights under the NHRBR; and (3) McCoy's negligent-infliction-of-emotional-distress claim are governed by statute, and requested the court reduce the award for those claims to $250,000 each. Also in December, Avon Place filed a motion for judgment notwithstanding the verdict ("JNOV"), challenging the verdict on all of Plaintiffs' claims. Relevant to this appeal, Avon Place argued that it was entitled to judgment on the punitive-damages award because there was insufficient evidence of actual malice by Avon Place employees. With regard to Plaintiffs' NHRBR claim, Avon Place argued that it was entitled to judgment because is duplicative of the Plaintiffs' survivorship claim.

{¶ 23} In March 2024, Plaintiffs filed a motion for attorney's fees and case expenses pursuant to the jury's finding of punitive damages. The court held a hearing on this motion in May 2024. Following the hearing the trial court issued

---

[3] We note that while Plaintiffs initially requested a hearing on the prejudgment interest, the parties stipulated to have the matter heard by the trial court on the briefs.

two thorough decisions in January 2025. In the first decision, the trial court denied Avon Place's JNOV motion. The court found that the conduct of Avon Place staff demonstrated evidence of actual malice — Marrero "ignored McCoy's cries to help [Andrews], who was in a precarious situation struggling to breathe." (Judgment Entry Denying JNOV, Jan. 13, 2025.) The court further found that the jury did not award double damages because the Estate's claims did not concern the same injury. The jury awarded damages for Andrews's survivorship action for pain and suffering while she was living on August 1, 2020, and the jury awarded separate damages for Andrews's statutory claim for NHRBR violations that occurred on July 23, 2020. (Judgment Entry Denying JNOV, Jan. 13, 2025.)

{¶ 24} In the second decision, the court granted Plaintiffs' motions for statutory caps, prejudgment interest, attorney fees, and case expenses. The court reduced the award on the applicable claims to $250,000 each, determined that Plaintiffs were entitled to $1,061,349.73 in attorney's fees and expenses, and found that Avon Place failed to make a good-faith effort to settle the case. (Judgment Entry Ordering Final Judgment, Jan. 13, 2025.) The court then issued judgment against Avon Place as follows:

> For [McCoy, the Administrator of the Estate] of [Andrews's] claim for wrongful death: $1,150,000.00.
>
> For [McCoy, the Administrator of the Estate] of [Andrews's] survivorship claim for pain and suffering relating to the events on August 1, 2020: $250,000.00.
>
> For [McCoy, the Administrator of the Estate] of [Andrews's NHRBR] claim for events occurring before August 1, 2020: $250,000.00.

For [McCoy's] claim for negligent infliction of emotional distress: $250,000.00.

For [McCoy, the Administrator of the Estate] of [Andrews's] punitive damages claim: $500,000.00, plus $1,061,349.73 in attorney's fees and expenses.

For [McCoy, the Administrator of the Estate] of [Andrews], prejudgment interest on $1,900,000.00 in compensatory [damages] at the legal rate of interest from April 1, 2021 through the date of this entry.

Post judgment interest is to accrue at the statutory rate.

(Judgment Entry Ordering Final Judgment, Jan. 13, 2025.)

{¶ 25} Avon Place now appeals, raising the following five assignments of error for review:

**Assignment of Error I:** The trial court erred in denying [Avon Place's] motion for judgment notwithstanding the verdict as to punitive damages.

**Assignment of Error II:** The trial court committed clear error in submitting interrogatories and instructions to the jury indicating that it could award punitive damages against [Avon Place] based solely on malicious actions by "an employee of [Avon Place]."

**Assignment of Error III:** The trial court erred in applying R.C. 2315.18(B)(2)'s $250,000 damages cap separately to each of the Estate's survivorship claims rather than to the total award of noneconomic damages.

**Assignment of Error IV:** The trial court erred in granting and failing to reduce [Plaintiffs'] request for attorney's fees and expenses.

**Assignment of Error V:** The trial court erred in awarding pre-judgment interest.

## II. Law and Analysis

### A. Judgment Notwithstanding the Verdict

{¶ 26} In the first assignment of error, Avon Place argues the trial court erred in denying its JNOV motion as to punitive damages. Avon Place's argument is twofold: (1) that the trial court applied the wrong standard for punitive damages against a corporate entity because the court failed to require evidence that Avon Place's officers participated in, acquiesced in, or ratified Marrero's conduct; and (2) that Marrero's actions did not rise to the level of actual malice.

### 1. JNOV Standard of Review

{¶ 27} Civ.R. 50(B)(1) governs JNOV motions and allows a party to "serve a motion to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with the party's motion." "If a verdict was returned, the court may allow the judgment to stand or may reopen the judgment. If the judgment is reopened, the court shall either order a new trial or direct the entry of judgment, but no judgment shall be rendered by the court on the ground that the verdict is against the weight of the evidence." Civ.R. 50(B)(3).

{¶ 28} On appeal, we review the trial court's ruling on a JNOV motion de novo. *Environmental Network Corp. v. Goodman Weiss Miller, L.L.P.*, 2008-Ohio-3833, ¶ 23, citing *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St.3d 107, 108 (1995). "[W]e must test whether the evidence, construed most strongly in favor of appellees, is legally sufficient to sustain the verdict." *Id.* Accordingly, we consider neither the weight of the evidence nor the credibility of the

witnesses when undertaking this review. *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.*, 81 Ohio St.3d 677, 679 (1998), citing *Wagner v. Roche Laboratories*, 77 Ohio St. 3d 116 (1996).

### 2. Punitive Damages — R.C. 2315.21

{¶ 29} Ohio law is well-settled that punitive damages are available in tort actions for "intentional, reckless, wanton, willful and gross acts." *Columbus Fin., Inc. v. Howard*, 42 Ohio St.2d 178, 184 (1975). Punitive damages, however, are not "an independent cause of action; rather, they arise incident to compensable harm." *Whetstone v. Binner*, 2016-Ohio-1006, ¶ 20, citing *Niskanen v. Giant Eagle, Inc.*, 2009-Ohio-3626, ¶ 12-13. Relevant to the instant case, R.C. 2315.21(C)(1) provides that punitive damages are recoverable from a defendant if "[t]he actions or omissions of that defendant demonstrate malice or aggravated or egregious fraud, or that defendant as principal or master knowingly authorized, participated in, or ratified actions or omissions of an agent or servant that so demonstrate."

### 3. Ratification

{¶ 30} We note that "[r]atification generally occurs when the employer with full knowledge of the facts, acts in a manner that manifests an intention to approve the unauthorized act of the agent-employee." *Davis v. May Dept. Stores Co.*, 2001-Ohio-1362, ¶ 20 (9th Dist.), citing *Bailey v. Midwestern Ent., Inc.*, 103 Ohio App.3d 181, 185 (10th Dist. 1995); *Williams v. Hyatt Legal Serv.*, 1990 Ohio App. LEXIS 934, *4 (9th Dist. Mar. 14, 1990). In the context of punitive damages, Avon Place contends that these damages can be awarded against it only if its officers ratified

Marrero's conduct. Plaintiffs, however, point out that this was not the grounds Avon Place argued in the trial court in its JNOV motion. Rather, Avon Place's sole argument was that it was entitled to JNOV because there is insufficient evidence of actual malice regarding Marrero's conduct.

{¶ 31} While we acknowledge Avon Place's contention that new arguments relating to preserved claims may be reviewed on appeal, in this instance, we review Avon Place's ratification arguments for plain error. We reach this conclusion because of what transpired at the trial court. The record is clear that the issue of ratification was not raised even though Avon Place had multiple opportunities to do so. First, Avon Place failed to include language requiring a finding of ratification in their jury instruction on punitive damages, which will be discussed in the second assignment of error. Then, the trial court adopted Avon Place's proposed instruction verbatim and Avon Place did not object. Next, Avon Place did not object to the interrogatories given to the jury. Lastly, Avon Place did not raise the issue of ratification in its JNOV motion.

{¶ 32} It is well-settled that errors not raised in the trial court may not be raised for the first time on appeal, and the failure to raise or object to the issue waives all but plain error on appeal. *Ohio Valley Business Advisors, L.L.C. v. AER Invest. Corp.*, 2017-Ohio-1283, ¶ 18 (8th Dist.) (by failing to raise arguments in the trial court, appellant waived all but plain error for purposes of the appeal.); *C4 Polymers, Inc. v. Huntington Natl. Bank*, 2015-Ohio-3475, ¶ 47 (8th Dist.) (applying waiver and plain error in context of a JNOV motion). Furthermore, "[i]n appeals of civil

cases, the plain error doctrine is not favored" and only applies "in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." (Citations omitted.) *Goldfuss v. Davidson*, 79 Ohio St.3d 116 (1997), syllabus. Because Avon Place repeatedly failed to raise the ratification issue at trial court, we find that it has waived this on appeal. And, for the reasons set forth below, we do not find that this is the exceptional case where plain error applies.

{¶ 33} As stated above, punitive damages are recoverable if a defendant, as a principal, knowingly ratified the actions or omissions of an agent. In general, acts committed within the scope of employment will be authorized, either expressly or impliedly, by the employer. *Combs v. Kobacker Stores, Inc.*, 1953 Ohio App.LEXIS 947, *6-7 (2d Dist. Feb. 3, 1953), citing *Cooley on Torts*, Fourth Edition, Volume 3, p. 68, Section 396; *Fulwiler v. Schneider*, 104 Ohio App.3d 398, 406 (1st Dist. 1995). In that situation, the doctrine of respondeat superior liability applies and the "plaintiff need not prove ratification to hold the employer liable." *Bardonaro v. GMC*, 2000 Ohio App. LEXIS 3479, *9 (2d Dist. Aug. 4, 2000.).

{¶ 34} A plaintiff needs to "prove ratification only where the employee's actions are outside the scope of employment[.]" *Bardonaro* at *9, citing *State ex rel. Riley Constr. Co. v. E. Liverpool Bd. of Edn.*, 10 Ohio St.2d 25, 29 (1967); *Bernardo v. Anello*, 61 Ohio App. 3d 453, 459 (8th Dist. 1988); *Fisher v. Hering*, 88

Ohio App. 107, 112 (5th Dist. 1948); *see Riotte v. Cleveland*, 2011-Ohio-4507, ¶ 18 (8th Dist.); *Fulwiler* at 406. "[A]nd if the employer expressly or impliedly ratifies willful and malicious conduct by an employee, an award of punitive damages is proper." *Bardonaro* at *9-10, citing *Saberton v. Greenwald*, 146 Ohio St. 414, (1946), paragraph three of the syllabus. We note that "[e]ven slight acts of ratification will be sufficient to support a claim of punitive damages against an employer." *Id.* at *10, citing *Saberton*; *Williams*, 1990 Ohio App. LEXIS 934 (9th Dist. Mar. 14, 1990).

{¶ 35} Here, Avon Place argues that an employer is not liable for punitive damages merely because the employee committed the alleged acts while acting within the scope of his employment. Rather, Avon Place relies primarily on *Saltzman v. Cleveland Trust Co.*, 35 N.E.2d 172 (8th Dist. 1938), and contends that in order to be held liable for punitive damages, the plaintiff must demonstrate either that the employer's own actions demonstrated malice or that the employer, as a principal, knowingly ratified the actions or omissions of its employee.

{¶ 36} To this contention, we find the *Fulwiler* case instructive. In that case, the First District Court of Appeals determined that "[t]o support an award of punitive damages against an employer for an employee's intentional tort, it is sufficient for the plaintiff to prove only that the employer ratified the employee's intentional misconduct, and the plaintiff need not also show that the tort was committed within the scope of the employment relationship." *Id.* at the syllabus. As a result, the *Fulwiler* Court found that trial court erred "when it instructed a jury

that proof of both elements was necessary to hold an employer liable for punitive damages." *Id.* Because Avon Place's argument focuses on ratification and not the scope of employment, we in turn limit our discussion to the issue of ratification.

{¶ 37} Avon Place maintains that punitive damages could not have been awarded against it because there was no evidence that it ratified Marrero's conduct. We disagree.

{¶ 38} In the present case, Plaintiffs adduced evidence at trial demonstrating that Avon Place ratified Marrero's conduct when Avon Place failed to act. As we stated in *Amato v. Heinika Ltd.*, 2005-Ohio-189 (8th Dist.), "the failure to act can be viewed as a manifestation of intent to ratify the agent's act." *Id.* at ¶ 6, citing *Tiersma, The Language of Silence*, 48 Rutgers L.Rev. 1 (1995). We went on to explain that ratification can be demonstrated

> "'by inaction or silence where the principal is fully informed of all of the material facts to the agent's action. If a principal is fully aware of the agent's unauthorized act and either takes a position inconsistent with non-affirmance or retains the benefits of the act, the principal has ratified the act. When a principal has full knowledge of the material facts of an agent's unauthorized act, silence may constitute ratification if a reasonable person could be expected to speak out against the unauthorized act.'"

*Amato* at ¶ 8, quoting *Brooks v. Bell*, 1998 Ohio App. LEXIS 1476, *1 (1st Dist. Apr. 10, 1998), quoting *Morr v. Crouch*, 19 Ohio St.2d 24 (1969).

{¶ 39} Here, the jury could reasonably conclude that Avon Place ratified Marrero's conduct when it failed to terminate or discipline Marrero. Marrero testified that she was responsible for making sure that trach patients could breathe,

have a clear airway, and setting up window visits. Following the incident, however, Marrero was not disciplined or terminated. The parties stipulated to such at trial. The court advised the jury that Marrero "was not disciplined or terminated as a result of her actions on August 1, 2020." (Tr. 850.) Additionally, Avon Place maintained its defense that Marrero's actions were within the applicable standard of care. Avon Place stated to the jury, "We didn't discipline or terminate her because she is a good nurse, because we don't believe she did anything wrong[.]" (Tr. 864.) In light of the foregoing, we find that the evidence at trial was sufficient to establish Avon Place's ratification of Marrero's conduct. Furthermore, we do not find plain error. This is not the exceptional case where the basic fairness, integrity, or public reputation of the judicial process was affected.

### 4. Actual Malice

{¶ 40} Avon Place next argues that even if there was sufficient evidence of ratification presented at trial, there was insufficient evidence to demonstrate that Marrero acted with actual malice in order to sustain a punitive-damages award.

{¶ 41} The Ohio Supreme Court has defined actual malice as "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty*, 32 Ohio St.3d 334, 336 (1987). In situations where the conduct at issue constitutes a conscious disregard for the rights and safety of another person, the trial court must "review the evidence to determine if reasonable minds can differ as to whether the

party was aware his or her act had a great probability of causing substantial harm. Furthermore, the court must determine that sufficient evidence is presented revealing that the party consciously disregarded the injured party's rights or safety." *Id.* We find that Plaintiffs presented sufficient evidence to support punitive damages under this standard.

{¶ 42} The evidence at trial included McCoy's testimony, Marrero's testimony, the video exhibits, and the EMS records. The scene before the jury was a daughter visiting her mother at a nursing home during COVID. McCoy observes something wrong with her mother and asks Marrero, "[W]hat's going on? What's with the rags[?]" Marrero turns and walks away. (Tr. 646.) The video footage then depicts Andrews in respiratory distress and McCoy uncertain of what steps to take next because of her fear of being kicked out of Avon Place. At the end of the video footage, McCoy states that she tried telling Marrero that the gauze was blocking Andrews's trach cuff but Marrero walked away. The jury reasonably believed that Marrero had the opportunity to respond, but walked out of the room, leaving Andrews in the room, with McCoy calling for help and pointing out that her mother is "not breathing." Furthermore, in describing the events, Marrero did not mention any knowledge of Andrews's not breathing, yet indicated to EMS that the "nursing home staff states family noticed patient not breathing through the window as they were approaching for a visit." (Tr. 353.)

{¶ 43} Notably, Avon Place moved for directed verdict during the compensatory-damages phase of the trial in which they argued that Plaintiffs did

not present sufficient evidence of actual malice. After hearing arguments on the issue, the court denied Avon Place's motion. In analyzing the issue, the court stated:

> Whether we believe it's true or not, I believe a big part of the cross-examination of [McCoy] was this idea that it was absurd to suggest that [Marrero] would ignore her, but her testimony was that [Marrero] ignored her. Whether the jury believes or doesn't believe it, different story. If she's yelling [Marrero], stop and [Marrero] is ignoring her while she's telling her there's a problem with her airway, if that's true, if that's to be believed by the jury — go ahead.

(Tr. 694.) The trial court reiterated this in its judgment entry denying Avon Place's Motion for JNOV:

> The Court finds there was evidence [Avon Place's] staff nurse ignored McCoy's cries to help [Andrews], who was in a precarious situation struggling to breathe. The Court further finds a reasonable person could conclude that the staff's conduct amounted to a conscious disregard for [Andrews's] rights, health, and safety, which had great probability of causing substantial harm.

(Judgment Entry Denying JNOV, Jan. 13, 2025.)

{¶ 44} Lastly, we find Avon Place's reliance on *Schmidt v. Derenia*, 2004-Ohio-5431 (10th Dist.), and *Lang v. Beachwood Pointe Care Ctr.*, 2017-Ohio-1550 (8th Dist.), factually distinguishable. In *Schmidt*, a truck driver struck debris on an interstate that punctured the truck's fuel tank. This caused the diesel fuel to leak, which led to a crash and a motorcyclist's death. To justify a finding of actual malice, the court considered what the trucker did during this timeframe. *Id.* at ¶ 25. The court found that while some of the actions the driver took may have been poor choices, reasonable minds could not have found the driver "so callous in her disregard for the rights and safety of others that society would deem it intolerable"

because of the mitigating actions taken by the truck driver before any injury occurred. *Id*. at ¶ 25.

{¶ 45} In *Lang*, this court found insufficient evidence of malice on behalf of the nursing home regarding the decedent-resident's fall from her wheelchair after being towed by her husband, who was another resident in a wheelchair. *Id*. at ¶ 60-61. We noted that there was no evidence of a "callous" mental state or a motive to injure the decedent, and the nursing home staff testified that, in the past, they either intervened or told the decedent's husband to stop when they observed him towing the decedent. *Id*. at ¶ 56.

{¶ 46} Here, Marrero's decision not to respond to McCoy's calls for help is not the same as the truck driver's actions to address the fuel leak in *Schmidt* or the nursing home's actions in *Lang*. This is a case where "a picture is truly worth a thousand words." Not only did the jury have the opportunity to observe, through video evidence, Andrews struggling to breathe and suffering cardiopulmonary arrest, the jury also observed Marrero's and Brian's actions while Andrews was in distress and McCoy continued to call for help, repeatedly exclaiming that her mother was "not breathing." In fact, Dr. Schweiger testified that if Marrero recognized at the onset that the gauze was covering the trach opening and removed or repositioned it, corrected the malpositioned tubing under Andrews's arm, and called Brian, if needed, for suctioning or a breathing treatment, then more likely than not, none of this would have happened to Andrews that day. Dr. Schweiger further testified that Brian's actions contributed to Andrews's death because of the delay in

recognizing Andrews's distress and the failure to immediately call Marrero for help to suction the trach or remove the inner cannula and provide oxygen and ventilation to Andrews.

{¶ 47} Thus, based on the foregoing, we find that a reasonable person can conclude that Marrero's conduct amounted to a conscious disregard for Andrews's rights, health, and safety. The trial court's denial of Avon Place's JNOV motion as it relates to punitive damages was proper.

{¶ 48} Accordingly, the first assignment of error is overruled.

**B. Jury Instructions and Jury Interrogatories**

{¶ 49} In the second assignment of error, Avon Place argues that the jury's award of punitive damages must be reversed because the trial court's jury instructions and interrogatories were erroneous. Avon Place challenges both the jury instructions and interrogatories under the plain-error doctrine, but for the reasons set forth below, we find that Avon Place's plain-error argument is misplaced in both regards.

{¶ 50} As an initial matter, we note that Avon Place drafted the jury instructions on punitive damages, which were adopted verbatim by the trial court, and Avon Place did not object to the instructions at trial.[4] Avon Place contends that it was plain error for the court to instruct the jury to award punitive damages solely on Marrero's actions. Plaintiffs, however, counter that while Avon Place asks us to

---

[4] In order to preserve the right to appeal the giving or failure to give an instruction, a party must object to the instruction before the jury begins its deliberations. Civ.R. 51(A).

consider these jury instructions under the guise of plain error, this is instead an issue of "invited error" because Avon Place drafted the jury instructions. We agree.

{¶ 51} "Under the invited error doctrine, 'a party is not entitled to take advantage of an error that he himself invited or induced.'" *State v. Doss*, 2005-Ohio-775, ¶ 5 (8th Dist.), quoting *State ex rel. Kline v. Carroll*, 2002-Ohio-4849; *State v. Smith*, 2002-Ohio-3114 (8th Dist.). As this court stated:

> "The 'invited error doctrine' prohibits a party from raising an error on appeal which she herself invited or induced the trial court to make." *In re Gray*, 8th Dist. Cuyahoga Nos. 75984 and 75985, 2000 Ohio App. LEXIS 1734, 4 (Apr. 20, 2000) (applying the invited-error doctrine when the testimony complained of was offered in response to a question posed by appellant's own attorney), citing *State ex rel. Fowler v. Smith*, 68 Ohio St.3d 357, 359, 1994-Ohio 302, 626 N.E.2d 950 (1994), and *Ctr. Ridge Ganley, Inc. v. Stinn*, 31 Ohio St.3d 310, 313, 511 N.E.2d 106 (1987). The doctrine, which is applied when counsel is "actively responsible" for the trial court's error, stands for the proposition that "'a litigant cannot be permitted, either intentionally or unintentionally[,] to induce or mislead a court into the commission of an error and then procure reversal of the judgment for an error for which he was actively responsible.'" *Yuse v. Yuse*, 8th Dist. Cuyahoga No. 89213, 2007-Ohio-6198, ¶ 14, quoting *State v. Campbell*, 90 Ohio St.3d 320, 324, 2000-Ohio 183, 738 N.E.2d 1178 (2000) and *Lester v. Leuck*, 142 Ohio St. 91, 93, 50 N.E.2d 145 (1943).

*Waechter v. Laser Spine Inst.*, 2023-Ohio-3715, ¶ 42 (8th Dist.).

{¶ 52} In the instant case, our review of Avon Place's proffered punitive damages jury instructions (jury instructions Nos. 1 and 2) compared to the actual jury instructions given by the trial court reveals no difference. The court gave Avon Place's proffered instructions verbatim, and Avon Place never objected to the instructions. As a result, Avon Place may not now use the instructions to its

advantage on appeal because it drafted the jury instructions of which it complains.[5] *McQueen v. Greulich*, 2014-Ohio-3714, ¶ 21 (8th Dist.) (where this court found invited error when the appellant proposed the jury instructions and collaborated with the court and appellee in drafting the instructions); *Patton v. Cleveland*, 95 Ohio App.3d 21, 26 (8th Dist. 1994).

{¶ 53} Avon Place next contends that interrogatory No. 1 contradicts R.C. 2315.21's punitive damages requirements. We note that just like the jury instructions, Avon Place also did not object to this jury interrogatory. The difference here, however, is that Avon Place did not draft the jury interrogatories, so the invited-error doctrine does not apply. Rather, Avon Place, relying on *O'Connell v. Chesapeake & O.R. Co.*, 58 Ohio St.3d 226 (1991), and *Lockwood v. Morgan*, 1991 Ohio App. LEXIS 5399 (12th Dist. Nov. 12, 1991), asks us to review for plain error.[6]

{¶ 54} We recognize that Ohio courts have consistently applied the waiver doctrine to claims of alleged error with jury interrogatories, without applying the plain-error doctrine, "when the appellant failed to object prior to the jury being discharged." *Druzin v. S.A. Comunale Co.*, 2015-Ohio-4699, ¶ 19 (8th Dist.). In *Druzin*, we addressed a similar situation where the appellant did not object to a jury interrogatory and stated:

---

[5] In any event, we do not find that the jury was improperly instructed.

[6] These cases are distinguishable. In *O'Connell*, the issue was the jury's inconsistent answers that resulted in plain error, not the language of the instructions or interrogatories, which is the circumstance of the instant case. In *Lockwood*, there was a statutory requirement as to the language of the jury interrogatories for findings of punitive damages under R.C. 2315.21, which is not required in the instant case.

Generally, the failure to object to an interrogatory constitutes waiver of any error on appeal. *Boewe v. Ford Motor Co.*, 94 Ohio App.3d 270, 279, 640 N.E.2d 850 (8th Dist.1992). A reviewing court will not consider any error which a party failed to bring to the trial court's attention at a time when that error could have been avoided or corrected by the court. *LeFort v. Century 21-Maitland Realty Co.*, 32 Ohio St.3d 121, 123, 512 N.E.2d 640 (1987). As stated by the Ohio Supreme Court, "the fundamental rule is that an appellate court will not consider any error which could have been brought to the trial court's attention, and hence avoided or otherwise corrected." *Schade v. Carnegie Body Co.*, 70 Ohio St.2d 207, 210, 436 N.E.2d 1001 (1982).

Similarly, "[i]f an appellant believed that the jury's verdict was substantially defective, the proper procedure was for [the appellant] to request the trial judge to poll the jurors." *McKiernan v. Home Sav. of Am.*, 93 Ohio App.3d 13, 16, 637 N.E.2d 384 (3d Dist.1994), citing Civ.R. 48. In the absence of such a request, a court "must assume appellant did not believe the verdict to be substantially defective." *Id.* At the very least, the appellant should object prior to the jury being discharged as a means to preserve any argument on appeal. *Id.*

*Id.* at ¶ 18.

{¶ 55} The interrogatory at issue, interrogatory No. 1, was submitted to the jury during the punitive-damages phase of the trial and inquired whether "plaintiff [has] proven by clear and convincing evidence that an employee of the defendant acted in actual malice towards the decedent, [Andrews], on August 1 of 2020, her date of death?" (Tr. 871.) Avon Place argues that this interrogatory should have explained that the jury must also find Avon Place's "ruling officers participated in, acquiesced in, or ratified the conduct of the employee." (Avon Place's Brief, p. 18.) Because Avon Place did not object to the interrogatory and did not request the trial judge to poll the jurors, we find that it has waived any error on appeal regarding this interrogatory.

{¶ 56} Therefore, the second assignment of error is overruled.

**C. Statutory Damages Cap**

{¶ 57} In the third assignment of error, Avon Place argues that the trial court erred in separately applying the $250,000 damages cap under R.C. 2315.18(B)(2) and allowing the Estate to recover $250,000 on its July 23, 2020 NHRBR claim in addition to $250,000 on its August 1, 2020 pain and suffering claim, for a total of $500,000 in noneconomic damages. Preliminarily, we note that Avon Place relies on R.C. 2315.18(B)(2), which is the statute relating to caps on noneconomic damages available in tort actions in general. However, because this is a medical claim, the applicable damage caps are outlined in R.C. 2323.43, which relates noneconomic damages available in medical malpractice actions. The trial court used this section in making its determination, and we will likewise address Avon Place's assigned error under R.C. 2323.43.

{¶ 58} When reviewing questions of statutory interpretation, our standard of review is de novo. *Electronic Classroom of Tomorrow v. Ohio Dept. of Edn.*, 2018-Ohio-3126, ¶ 11, citing *Ceccarelli v. Levin*, 2010-Ohio-5681, ¶8. When a statute is plain and unambiguous, we apply the statute as written, and no further interpretation is necessary. *State ex rel. Savarese v. Buckeye Local School Dist. Bd. of Edn.*, 74 Ohio St.3d 543, 545 (1996), citing *State ex rel. Herman v. Klopfleisch*, 72 Ohio St.3d 581, 584 (1995).

{¶ 59} "R.C. 2323.43(A) creates a two-tiered system imposing limits on the award of noneconomic damages depending on the severity of the plaintiff's injury."

*Paganini v. Cataract Eye Ctr. of Cleveland*, 2025-Ohio-275, ¶ 60.  Relevant to this

appeal, under the first tier, a cap of $250,000 applies to certain types of injuries:

> Except as otherwise provided in division (A)(3) of this section, the
> amount of compensatory damages that represents damages for
> noneconomic loss that is recoverable in a civil action under this section
> to recover damages for injury, death, or loss to person or property shall
> not exceed the greater of two hundred fifty thousand dollars or an
> amount that is equal to three times the plaintiff's economic loss, as
> determined by the trier of fact, to a maximum of three hundred fifty
> thousand dollars for each plaintiff or a maximum of five hundred
> thousand dollars for each occurrence.

R.C. 2323.43(A)(2).  "Noneconomic damages" are defined as

> "nonpecuniary harm that results from an injury, death, or loss to
> person or property that is a subject of a civil action upon a medical,
> dental, optometric, or chiropractic claim, including, but not limited to,
> pain and suffering, loss of society, consortium, companionship, care,
> assistance, attention, protection, advice, guidance, counsel,
> instruction, training, or education, disfigurement, mental anguish, and
> any other intangible loss."

*Paganini* at ¶ 61, quoting R.C. 2323.43(H)(3).  Additionally, under R.C. 2323.43

(D)(1), the trial court is prohibited from entering judgment for noneconomic loss in

an amount that exceeds the damages cap.

> {¶ 60} Here, the trial court found that the Plaintiffs presented

> evidence that (on July 23, 2020) the defendant's staff caused
> [Andrews] to be seated in awkward, uncomfortable slumped-over
> positions that were inappropriate and improper to maintain
> appropriate care, and could be considered undignified, discourteous,
> and disrespectful treatment in violation of the NHRBR.  Reviewing the
> evidence, the Court finds reasonable minds could conclude that
> plaintiff did prove that before August 1, 2020, the defendant violated
> rights afforded to her by the NHRBR causing [Andrews's] mental
> anguish, humiliation or embarrassment.

> The jury did not award double damages for one survivorship claim.  The
> [E]state's claims did not concern the same injury.  The jury awarded

damages ($300,000.00) for decedent's personal injury survivorship action for pre-death conscious pain and suffering arising from the occurrence while she was living on August 1, 2020 [under R.C. 2305.21], and the jury awarded separate damages ($500,000.00) for the decedent's statutory claim for violations of the NHRBR that occurred before August 1, 2020.

(Judgment Entry Denying JNOV, Jan. 13, 2025.)

{¶ 61} The court went on to state that "[t]he survivorship and wrongful death actions that arose from the same incident on August 1, 2020, are established by one set of operative facts. The jury verdict on those claims is predicated on [Avon Place's] negligence that caused [Andrews's] injury and death on August 1, 2020. The negligent violations of the NHRBR arose under a different set of operative facts for events that occurred before August 1, 2020." (Judgment Entry Denying JNOV, Jan. 13, 2025.) As a result, the court found that "[i]n accordance with R.C. 2323.43(A)(2), the award for Plaintiffs' survivorship claim for non-economic damages suffered by [Andrews] on the date of her death is capped at $250,000.00; the award for Plaintiffs' [NHRBR] claim is determined to be a separate occurrence that occurred prior to the date of her death and is capped separately at $250,000.00[.]" (Judgment Entry Denying JNOV, Jan. 13, 2025.).

{¶ 62} Avon Place contends that the court should have applied the $250,000 cap to the combined total award of noneconomic damages, rather than to each claim separately. Whereas, Plaintiffs, relying on *Cunning v. Windsor House, Inc.*, 2023-Ohio-352 (11th Dist.), contend that in certain circumstances damages could be

awarded for NHRBR violations that occurred separately from the injuries giving rise to a plaintiff's survivorship claims. We find this case instructive.

{¶ 63} In *Cunning*, the decedent suffered a fall in a nursing home that resulted in a cervical spine injury and her death five days later. The jury returned a verdict in favor of the administrator of the decedent's estate and representative of her beneficiaries, and against the nursing home. The jury awarded the estate

> $50,000 for [the decedent's] "pre-death pain and suffering," $15,803.13 for [the decedent's] "past economic damages" (a stipulated amount), and $5,000 for [the daughter's] "damages." A $500,000 award of damages for violation of Ohio's [NHRBR] "to compensate for the injuries proximately caused by the negligence of" [the nursing home] was made in a separate finding. The jury also returned a general verdict in favor of the estate. The trial court granted [the nursing home's] motion for a directed verdict on the issue of punitive damages and dismissed the jury. The trial court granted the estate's posttrial motion for prejudgment interest and denied [the nursing home's JNOV motion].

*Id.* at ¶ 1.

{¶ 64} On appeal, the nursing home argued the trial court erred: (1) in denying its JNOV motion because the estate is receiving two sets of compensatory damages for the same injury under two different theories of recovery — negligence and a violation of the decedent's rights under the NHRBR and (2) in failing to apply the compensatory damages cap under R.C. 2323.43(A)(2) to the jury's award of damages for the decedent's pre-death pain and suffering and for a violation of the NHRBR. *Id.* at ¶ 38.

{¶ 65} The *Cunning* Court determined that the nursing home, the trial court, and the estate

appear to have confused, or at least inartfully intermingled, multiple theories of recovery with the specific items of damages awarded for two underlying claims for relief, i.e., the estate's wrongful death and survivorship claims. But despite this, we find the jury followed the law as instructed by the trial court on each claim, answered each interrogatory appropriately in light of those instructions, and most importantly, did not award double damages for each claim.

*Id.* at ¶ 45.

{¶ 66} The *Cunning* Court explained

Even though usually litigated in a single proceeding and brought by the same nominal party, wrongful death and survival claims are independent, distinct claims that belong to separate individuals. *Peters v. Columbus Steel Castings Co.*, 115 Ohio St.3d 134, 2007-Ohio-4787, 873 N.E.2d 1258, ¶ 17; *In re Estate of Craig*, 89 Ohio App.3d 80, 84, 623 N.E.2d 620 (12th Dist.1993). A wrongful death claim belongs exclusively to the decedent's beneficiaries and is meant to cover pecuniary and emotional loss suffered by those beneficiaries as a result of the death. *Peters* at ¶ 10; *Craig* at 84. By contrast, a survival claim is simply the action the decedent could have brought for the injuries he suffered prior to his death and is generally for the benefit of the estate. *Peters* at ¶ 10; *Craig* at 84.

. . .

While the same act may give rise to survivorship and wrongful death claims, the claims for relief are separate and distinct and are intended to accomplish very different purposes.

*Id.* at ¶ 46-47. The *Cunning* Court agreed with the nursing home that "a double recovery of compensatory damages is not permitted. A plaintiff, however, is permitted to proceed under different theories of recovery, so long as only one set of damages is awarded." *Id.* at ¶ 50, citing *Depompei v. Santabarbara*, 2015-Ohio-18, ¶ 48 (8th Dist.) (There was no error in allowing the appellant to present alternative theories where he was permitted a single recovery.). The court further agreed with the nursing home that "under the circumstances of this case, the NHRBR does not

provide for additional recovery (apart from punitive damages, which the trial court found was not warranted in this case); that is, an additional amount on top of those awarded for the survivorship and wrongful death claims." *Id.* at ¶ 53. The court cautioned "that is not what occurred in this case." *Id.*

{¶ 67} In certain circumstances, however, the court acknowledged that damages could be awarded for violations of the NHRBR that occurred separately from the injuries giving rise to a plaintiff's survivorship claims. The *Cunning* Court explained:

> While one could envision a scenario in which there are multiple injuries at issue in the same case — one resulting from ordinary negligence and another from a negligent violation of the NHRBR or a violation of a right afforded by the NHRBR that does not result in bodily injury — in this case, the estate's claim for medical negligence and violations of the NHRBR both concern the same injury. Thus, it would seem the cumulative remedy rule of statutory construction applies.

*Id.* at ¶ 61. The court further explained that, in its case, the survivorship claim and the NHRBR claim both concerned the same injury. The court concluded that "any decision on the interpretation of the NHRBR in that regard is premature, most fundamentally because those circumstances are not presented in this case since both theories of recovery concern the same operative facts." *Id.* at ¶ 62.

{¶ 68} Here, however, the record demonstrates two clearly separate events concerning different operative facts. The Estate's claim for violations of Andrews's NHRBR claim is unrelated to its survivorship claim for the events on August 1, 2020. It is not an alternate theory for recovery, but rather a separate and individual claim for recovery based upon a completely separate event. The Plaintiffs presented

evidence that on July 23, 2020, Avon Place staff caused Andrews to be seated in an awkward, uncomfortable slumped-over position in a chair. These pictures depict Andrews sitting in slumped-over position and support Plaintiffs' claim that Avon Place did not maintain appropriate care. Avon Place's actions were considered undignified, discourteous, and disrespectful treatment in violation of Andrews's rights under the NHRBR. The jury instructions made this clear, and the interrogatories demonstrate the jury understood this claim was separate from the incident on August 1, 2020, which resulted in Andrews's death.

{¶ 69} Thus, based on the foregoing, we find that the trial court did not err in permitting the Estate to recover $250,000 in noneconomic damages for Andrews's pain and suffering as a result of the failures in care on August 1, 2020. The trial court was also correct in permitting the Estate to recover $250,000 in noneconomic damages for Andrews's NHRBR claim, which relates to a separate incident on July 23, 2020. We agree with the trial court that these are separate occurrences with separate noneconomic damages.

{¶ 70} Accordingly, the third assignment of error is overruled.

**D. Attorney Fees and Expenses**

{¶ 71} In the fourth assignment of error, Avon Place argues that the trial court's award of attorney fees and litigation expenses in excess of $1,000,000 were "unreasonable and contrary to Ohio law." (Avon Place's Brief, p. 21.)

{¶ 72} Generally, Ohio courts follow the "American rule" regarding attorney fees: "each party is responsible for its own attorney fees." *Phoenix Lighting Group,*

*L.L.C. v. Genlyte Thomas Group, L.L.C.*, 2020-Ohio-1056, ¶ 9, citing *Wilborn v. Bank One Corp.*, 2009-Ohio-306, ¶ 7.  An exception to this rule "allows an award of attorney fees to the prevailing party as an element of compensatory damages when the jury finds that punitive damages are warranted." *Id.*, citing *Zoppo v. Homestead Ins. Co.*, 71 Ohio St.3d 552, 558 (1994); *New York, Chicago & St. Louis RR. Co. v. Grodek*, 127 Ohio St. 22, 24-25 (1933) ("[F]acts which justify the infliction of exemplary damages will also justify the jury in adding the amount of counsel fees to the verdict, not as a part of exemplary damages, but as compensatory damages."); *see also Galmish v. Cicchini*, 90 Ohio St.3d 22, 35 (2000) ("'If punitive damages are proper, the aggrieved party may also recover reasonable attorney fees.' . . .  In other words, 'attorney fees may be awarded as an element of compensatory damages where the jury finds that punitive damages are warranted.'"), quoting *Columbus Fin., Inc. v. Howard*, 42 Ohio St.2d 178, 183 (1975), and *Zoppo* at 558.

{¶ 73} In *Bittner v. Tri-Cty. Toyota, Inc.*, 58 Ohio St.3d 143 (1991), the Ohio Supreme Court set forth a two-part test for determining what constitutes "reasonable" attorney fees.  First, the trial court multiplies the number of hours reasonably expended by the attorney by a reasonable hourly rate.  *Id.* at 145.  This calculation provides "'an initial estimate of the value of the lawyer's services,'" *id.*, quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983), and "is sometimes referred to as the 'lodestar.'"  *Phoenix* at ¶ 1.  The trial court may then adjust the fee upward or downward based on the factors listed in Prof.Cond.R. 1.5(a).  *See Bittner* at syllabus; *Phoenix Lighting* at ¶ 12.  These factors include:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services;

(8) whether the fee is fixed or contingent.

Prof.Cond.R. 1.5(a).

{¶ 74} The *Phoenix Lightning* Court cautioned, however, that "[e]nhancements to the lodestar should be granted rarely and are appropriate when an attorney produces objective and specific evidence that an enhancement of the lodestar is necessary to account for a factor not already subsumed in the lodestar calculation." *Phoenix Lighting* at paragraph one of the syllabus, citing *Perdue v. Kenny A.*, 559 U.S. 542 (2010), *Bittner*, 58 Ohio St.3d 143 (1991) (modified). The "party seeking an enhancement to the calculation of attorney fees based upon the reasonable hourly rate multiplied by the number of hours worked bears the burden of presenting evidence to establish that an adjustment is appropriate based on a factor not already subsumed within the lodestar." *Id*. at ¶ 20. The trial court then has "discretion to modify the presumptive calculation of an attorney-fee award —

the reasonable hourly rate multiplied by the number of hours worked — but any modification must be accompanied by a rationale justifying the modification." *Id.*

{¶ 75} On appeal, our review of the trial court's award of attorney fees "should not be reversed absent a showing that the court abused its discretion." *Bittner v. Tri-County Toyota, Inc.*, 58 Ohio St.3d 143, 146 (1991). An abuse of discretion occurs when a court exercises "its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35. The *Bittner* Court explained:

> "It is well settled that where a court is empowered to award attorney fees by statute, the amount of such fees is within the sound discretion of the trial court. Unless the amount of fees determined is so high or so low as to shock the conscience, an appellate court will not interfere. The trial judge which participated not only in the trial but also in many of the preliminary proceedings leading up to the trial has an infinitely better opportunity to determine the value of services rendered by lawyers who have tried a case before him than does an appellate court."

*Id.* at 146, quoting *Brooks v. Hurst Buick-Pontiac-Olds-GMC, Inc.*, 23 Ohio App.3d 85, 91 (12th Dist. 1985).

{¶ 76} In the instant case, the jury awarded Plaintiffs attorney fees as part of its punitive damages finding.[7] The parties then engaged in post-trial briefing on the matter. In their motion for attorney fees and expenses, Plaintiffs stated that they entered into a contingency agreement with counsel. Plaintiffs further stated that lead counsel's billing rate is $600/hour and the total number of hours worked, which were "conservatively constructed," was 839.1 hours for lead counsel, his

---

[7] We note that the jury instructions only stated "attorney fees" and not "expenses." (Tr. 851.)

associates, and paralegal. According to Plaintiffs, if lead counsel's law firm was paid as worked progressed in this matter, it would have been paid a minimum of $364,284. Because the matter was on a contingency, Plaintiffs requested that counsel's fee be enhanced by a factor of 2.65 in order to equal the contingent fee on a final judgment of $2.4 million. Plaintiffs further requested expenses in the amount of $95,997.13. Avon Place opposed this motion, and Plaintiffs filed a reply to the opposition. The trial court held a hearing on the motion, where the court heard testimony from Plaintiffs' lead counsel, Plaintiffs' expert, Avon Place's lead counsel, and Avon Place's expert.[8] Following the conclusion of the hearing, the court awarded Plaintiffs a total of $1,061,349.73 in attorney fees and expenses.

{¶ 77} Avon Place contends that these attorney fees and expenses were unreasonable because (1) Plaintiffs' motion for attorney fees was untimely; (2) the hourly rates are excessive; (3) the trial court misapplied the lodestar and the application of a 2.65 multiplier was improper; (4) Plaintiffs' attorney fees are unreliable estimations; and (5) the jury only awarded fees not expenses.

{¶ 78} We address Avon Place's timeliness argument first. Avon Place contends that Plaintiffs' motion for attorney fees was untimely because it was filed after the 28-day deadline following the entry of judgment as required by Civ.R. 59(B), which provides in pertinent part: "a motion for . . . attorney fees must be served within twenty-eight days of the entry of judgment or, if the clerk has not

---

[8] We have reviewed the transcript of this proceeding, which was filed under seal.

completed service of the notice of judgment within the three-day period described in Civ.R. 58(B), within twenty-eight days of the date when the clerk actually completes service." Civ.R. 58(B) provides that a judgment is entered when a general verdict is rendered, journalized by the court, and journalized by the clerk.

{¶ 79} In the instant case, the jury returned its general verdict in Plaintiffs' favor on November 17, 2023, and its award of punitive damages on November 27, 2023. On November 28, 2023, the trial court issued a journal entry announcing the jury's verdict regarding the compensatory phase of the trial. The court then issued a journal entry on December 7, 2023, announcing that the jury rendered a verdict in Plaintiffs' favor in the "amount of $500,000 for punitive damages, including a reasonable amount in attorney fees." (Journal Entry, Dec. 7, 2023.) On March 28, 2024, Plaintiffs filed their motion for attorney fees and cases expenses.

{¶ 80} According to Avon Place, in order for Plaintiffs' motion to be timely, Plaintiffs had to file their motion by December 26, 2023, which was 28 days after "the trial court entered its judgment and journalized the general verdict" on November 28, 2023. (Avon Place's Brief, p. 24.) Plaintiffs counter that their motion was timely because the November 28, 2023 journal entry, which outlined the jury awards granted to them from the compensatory phase of trial did not constitute a judgment, and the judgment that satisfied the civil rules of procedure was not issued until January 13, 2025. We agree with Plaintiffs.

{¶ 81} A review of the docket reveals that the trial court issued journal entries reciting its progress throughout the trial. These entries do not constitute a Civ.R. 58

judgment entry; they are status updates. Notably, the November 28, 2023 journal entry relied upon by Avon Place did not even mention punitive damages or attorney fees and did not address the outstanding issue of what statutory damages caps apply to arrive at the final judgment. It was not until December 7, 2023, that the court announced that Plaintiffs were awarded "a reasonable amount in attorney fees" that was yet to be determined. (Journal Entry, Dec. 7, 2023.) Plaintiffs acknowledged that this issue was outstanding in their motion for judgment with statutory caps applied, which was filed on December 12, 2023. In this motion, the Plaintiffs requested that the attorney fee award be determined by the trial court at a separate hearing. Further evidencing that there was no judgment, the trial court added Plaintiffs' motion for attorney fees to the post-trial briefing and extended Plaintiffs time to file their motion to March 28, 2024. *See* Journal Entries dated Jan. 22, 2024 and Mar. 15, 2024.

{¶ 82} Based on our review, it appears that the trial court did not order final judgment until January 13, 2025, when the court issued its "judgment entry denying [Avon Place's] motion to stay execution and ordering final judgment." Here, the court applied the statutory caps and issued judgment. Tellingly, the court also found that Avon Place's motion to stay was "premature as the Court had not yet issued judgment on the verdicts of the Jury." (Judgment Entry Ordering Final Judgment, Jan. 13, 2025.) In light of the foregoing, we find that Plaintiffs' motion for attorney fees and expenses was timely filed. Plaintiffs filed their motion in March 2024 (with

leave from the court), which was prior to the issuance of the court's final judgment in January 2025.

{¶ 83} Next, Avon Place challenges the attorney-fees award by arguing that the hourly rates of Plaintiffs' counsel were inflated and disconnected from the Northeast Ohio legal market. Avon Place contends that Plaintiffs' lead counsel's hourly rate of $600/hour is excessive, as well as the respective $250/hour and $475/hour rates for lead counsel's associates. Avon Place further contends that the Laffey Matrix used by Plaintiffs to justify the rate was not applicable.[9] Rather, Avon Place argues that a rate of $350/hour as recommended by the Ohio State Bar Association Rate ("OSBA") would be a more reasonable rate for lead counsel under the circumstances of this case and the rates of $250/hour and $300/hour for lead counsel's associates.[10] (Avon Place's Brief, pg. 23.) As a result, Avon Place maintains that the hourly rates the trial court used in its lodestar analysis were inflated. We disagree.

{¶ 84} As stated above, when determining what constitutes "reasonable" attorney fees, the trial court multiplies the number of hours reasonably expended by

---

[9] The Laffey Matrix is "a database of fees established in 1992 by the U.S. Attorney's office and accepted by the federal bar in the District of Columbia, updated annually based on the legal services component of the consumer price index[.] [T]his database, however, applies only to DC counsel[.]" *Am. Chem. Soc. v. Leadscope, Inc.*, Franklin C.P. No. 02 CVC-07-7653, 26 (Feb. 5, 2009). According to its website, adjustments have been made for geographic differences for other cities like Baltimore. The Laffey Matrix, https://laffeymatrix.com (accessed Nov. 7, 2025) [perma.cc/PM42-RD5A].

[10] We note that the $250/hour rate Avon Place suggests is the same rate Plaintiffs' counsel charged.

the attorney by a reasonable hourly rate.  *Bittner*, 58 Ohio St.3d at 145 (1991).  In the case at hand, the evidence demonstrated that while Plaintiffs' lead counsel works mainly on contingent fee matters, the law firm where he is employed sets his hourly rate in noncontingent matters.  The firm reviews and sets attorney hourly rates on an annual basis based upon prevailing rates in the industry and the competency and experience of the attorneys in the Cleveland area.  Lead counsel has been with the firm for over 36 years and has tried over 50 injury and wrongful death cases to the jury.  During the time that lead counsel worked on Plaintiffs' case, his firm rate was $600/hour and his associates rates were $250/hour and $475/hour.  His associates had been with the firm approximately four years and 27 years, respectively.

{¶ 85} Additionally, Plaintiffs' attorney fees expert, who was admitted to the bar in 2011 and has been practicing medical malpractice and nursing home cases since then, opined that when considering the lodestar, the Laffey Matrix, the OSBA Economics of Law Practice report, the locality of the practice, the results in the instant case, and the reputation and skill level of Plaintiffs' counsel, the requested rates were reasonable.[11]  Additionally, the number of hours worked and advanced expenses were also reasonable and "considerably lower" than what Plaintiffs' expert expected. (Tr. 911.)  With regard to lead counsel, Plaintiffs' expert noted that he is a member of many "invitation only" groups for top nursing home attorneys across the United States and stated that lead counsel is well within the 95th percentile of

---

[11] While Plaintiffs cite to the Laffey Matrix, it was not used to justify the hourly rate, but rather for comparison purposes.

attorneys in the Cleveland area. According to Plaintiffs' expert, when using the 2019 OSBA economics report as a reference, this percentile equates to $595/hour "in 2019 money," which he believed is "$741 in today's money." (Tr. 905.) Notably, when Avon Place's trial counsel was asked about the OSBA economics report at the hearing, he agreed that Plaintiffs' lead counsel was in the top 95th percentile of plaintiff attorneys handling nursing home cases and acknowledged the 2019 OSBA hourly rate for attorneys in this percentile is $595/hour. And as to lead counsel's associates, Plaintiffs' expert testified that their respective hourly rates are approximately $20-$50 lower per hour than the OSBA rates.

{¶ 86} Avon Place's expert, who was admitted to the bar in 2002 and has never litigated a nursing home or medical malpractice case, opined that Plaintiffs' attorney fees were unreasonable and excessive. Additionally, Avon Place's counsel acknowledged that while she personally has never handled these cases, she has familiarity with the process because of her work overseeing the grievance committee at the bar association and admitted she never sat on the panel and determined reasonableness of fees. Although Avon Place's expert opined that the $600/hour rate under the OSBA guidelines was "not reasonable" and "excessive," the expert did not opine as to what would constitute a reasonable rate for an employee of lead counsel's law firm. (Tr. 931.) Furthermore, the expert could not "point to anything really bad" regarding lead counsel's billing entries even though she stated that his fee was unreasonable. (Tr. 951.) And while she indicated that lead counsel could have delegated some of his work to his associate or paralegal so it could be billed at

lesser rate, Avon Place's expert did not dispute that lead counsel actually completed the work or that lead counsel spent a reasonable amount of time representing Plaintiffs. In fact, Avon Place's expert testified, "I didn't have an issue with the amounts of time." (Tr. 950.)

{¶ 87} We agree with the trial court's determination that upon reviewing this evidence, "the hourly rates for Plaintiffs' counsel were reasonable[.]" (Judgment Entry Ordering Final Judgment, Jan. 13, 2025.) These rates are neither inflated nor inappropriate in light of the extraordinary results of the case and the reputation and skill level of Plaintiffs' counsel. The trial court reviewed the conflicting testimony and ultimately agreed with Plaintiffs as what the reasonable rates are for the caliber of attorney in this case. The trial court did not exercise its judgment in an unwarranted way in reaching this conclusion.

{¶ 88} With regard to Avon Place's lodestar argument, it contends that that Plaintiffs did not present any evidence to support a multiplier and this is not the rare case in which an enhancement is appropriate. As a result, Avon Place maintains that it was "legally inappropriate" for the trial court to apply a multiplier of 2.65 to the lodestar. (Avon Place's Brief, pg. 23.) We disagree.

{¶ 89} As the *Phoenix Lighting* Court noted, it is within the trial court's discretion "to modify the presumptive calculation of an attorney-fee award — the reasonable hourly rate multiplied by the number of hours worked — but any modification must be accompanied by a rationale justifying the modification." *Id.*

at ¶ 20. The trial court, in the instant case, recognized this and explained its rationale as follows:

> While this figure, the "Lodestar amount," is presumptively reasonable, it can be enhanced when necessary "to provide reasonable compensation, that is, if the lodestar does not take into consideration any factor that may be properly considered in determining a reasonable fee." One such example identified by the *Phoenix* Court occurred in the United States Supreme Court case of case of *Perdue v. Kenny A.*, 559 U.S. 542, 130 S.Ct. 1662, 176 L.Ed.2d 494 where an enhancement of the Lodestar was proper based upon the quality of representation, including the contingency of the case and the fact that counsel had not been paid as the action progressed and had advanced the cost of the litigation. Pursuant to *Perdue*[,] the Court in its discretion can adjust the lodestar amount upward or downward, if the 1.5(a) factors are not entirely subsumed within the lodestar calculation.
>
> In this instance, considering the factors such as the fee customarily charged in the locality, the injuries and damages involved in the case, the results obtained, the fact that Plaintiffs' counsel was not paid during the litigation and that they advanced litigation expenses, as well as the fact that the fee was contingent, this Court finds that a multiplier of 2.65 is an appropriate modification to the Lodestar. . . .

(Judgment Entry Ordering Final Judgment, Jan. 13, 2025.)

{¶ 90} A review of the record reveals that while Avon Place's expert opined that Plaintiffs did not indicate any factors that were not already subsumed by the lodestar, Plaintiffs' expert opined that a 2.65 multiplier was appropriate. Plaintiffs' expert opined, in detail, that a contingent fee of 40% is customary for nursing home cases in Ohio. He further opined that the 2.65 multiplier was appropriate because of lead counsel's skill level and reputation, the fact that hourly fees do not take into account contingent fees, the fact that punitive damages were awarded, and the multiplier of Plaintiffs' attorney fees resulted in a fee equal to 40 percent of the jury's total verdict, which was appropriate because of the extraordinary results of this case.

(Tr. 915.) Plaintiffs' expert testified that "the multiplier is worthy just because of the result. This is a significantly high result. . . . In addition, you also don't see punitive damages very often, and that demonstrates the amount of work that was put into this case." (Tr. 915.)

{¶ 91} The trial court considered the conflicting testimony, the Prof.Cond.R. 1.5(a) factors, as well as the fact that Plaintiffs' counsel was not paid during the litigation and the litigation expenses were advanced, the fee was contingent, the injuries and damages involved, the results obtained, and the fee customarily charged in the area, and found that a multiplier of 2.65 was an appropriate modification to the lodestar. Therefore, based upon the court's rationale in justifying the upward modification, which is consistent with the analysis in *Phoenix Lighting*, we cannot find the trial court abused its discretion. Our review of the record supports the court's determination that several of the Prof.Cond.R. 1.5(a) factors were not entirely subsumed by the lodestar.

{¶ 92} Avon Place's next challenge to the attorney fees award attacks the reliability of Plaintiffs' fee bills. Avon Place does not challenge any particular aspect of the fee bills, but rather argues that the bills were unreliable because the time records were recreated years after the fact. In support of its argument, Avon Place cites to *Bigler v. Personal Serv. Inc. Co.*, 2014-Ohio-1467 (7th Dist.), for the proposition that contemporaneous time records are required, noting that "[a]n attorney should keep an accurate record of time and resources expended in order to be able to provide satisfactory proof of the reasonable value of the legal services."

*Id.* at ¶ 196.  Plaintiffs, however, also cite to *Bigler*, contending that it supports their reconstructed hours.  We agree with Plaintiffs.

{¶ 93} In *Bigler*, the Seventh District Court of Appeals considered the reconstructed hours of counsel, who handled a personal injury contingency fee matter and did not keep contemporaneous time records for the duration of the litigation.  While acknowledging that an attorney should keep an accurate record of time and resources expended, the court "recognized that attorneys operating under a contingency contract sometimes do not maintain detailed records of their hours and noted that the lack of accurate record-keeping 'sometimes' makes it difficult to establish the reasonable value of services."  *Id.* at ¶ 196, citing *Reid, Johnson, Downes, Andrachik & Webster v. Lansberry*, 68 Ohio St.3d 570, 576 (1994).

{¶ 94} The *Bigler* Court noted that "[c]ontemporaneous time records are preferred, but not required."  *Id.* at ¶ 197, citing *Miller v. Leesburg*, 1998 Ohio App. LEXIS 5645 (10th Dist. Dec. 1, 1998).  The court went on to state, "[a]s contemporaneous time records are 'not absolutely mandatory in making a determination of fees,' reconstruction by the attorney and confirmation by an expert is permissible."  *Id.*, quoting *In re Estate of Wood*, 55 Ohio App. 2d 67, 75 (10th Dist. 1977).  Ultimately, the *Bigler* Court found no abuse of discretion by the trial court for accepting the reconstructed hours.  *Id.* at ¶ 200.

{¶ 95} Similarly, the case before us is a personal injury contingency matter where no contemporaneous time records were kept.  At the hearing on Plaintiffs' motion for attorney fees and in the affidavit in support of the motion, Plaintiffs' lead

counsel explained that his firm does not keep track of hours in contingency agreement matters, the submitted billing statements were based on completed work, the billings were supported by documentation in the file on the specific work completed, and the billings were a conservative measure of the total hours worked on the case.

{¶ 96} Specifically, Plaintiffs' lead counsel averred that his "firm does not regularly record the time of lawyers in contingency matters. In this case we were able to reconstruct some of our time by reviewing our case management program, our calendars and our e-mail history. Attached are time logs for me, [an associate attorney] and our [paralegal], which reflect the amount of time we could verify." (Plaintiff's Motion for Attorney Fees and Case Expenses Pursuant to Jury's Findings of Punitive Damages, exhibit No. 1, Mar. 28, 2024.) At the hearing, Plaintiffs' lead counsel explained in detail the firm's case-management system and how time is recorded. Lead counsel further averred that the minimum value of hours performed was $364,284 and the hours listed in the logs "are derived from documented sources and are a conservative measure of the hours devoted to the case." (Plaintiffs' Motion for Attorney Fees and Case Expenses Pursuant to Jury's Findings of Punitive Damages, exhibit No. 1, Mar. 28, 2024.)

{¶ 97} Additionally, the billings were further supported by Plaintiffs' expert, who opined that "given the difficulties in this case, the result achieved, the reputation, skill, and experience of the lawyers involved, the time spent on the case to the exclusion of other work, the complexity of the issues involved, and the

exceedingly low number of lawyers who would have taken this case all the way to trial let alone achieve this result, the reasonable attorney fees are 40% of the verdict. $960,000 is the prevailing rate in the community. Accordingly, the hourly rate of $364,284.00 with a 2.65 multiplier is the appropriate and reasonable calculation of attorneys' fees. " (Plaintiffs' Motion for Attorney Fees and Case Expenses Pursuant to Jury's Findings of Punitive Damages, exhibit No. 2, Mar. 28, 2024.)

{¶ 98} Based on the foregoing, it is clear that the trial court did not accept Plaintiffs' counsel's' "dusty memories and haphazard points of reference such as calendar and email entries" "wholesale" as Avon Place contends. (Avon Place's Brief, p. 22.) Rather, the court reviewed the above evidence and determined that the recreated time records, which were confirmed by Plaintiffs' expert, were sufficient. As the *Bigler* Court noted, this is a permissible way to establish time records when contemporaneous records are not kept. *Bigler*, 2014-Ohio-1467, at ¶ 197 (7th Dist.), citing *In re Estate of Wood*, 55 Ohio App.2d 67 (10th Dist. 1977). The trial court presided over the case and was in the best position to determine if this fee request was accurate. We find no abuse of discretion in the trial court's acceptance of Plaintiffs' reconstructed hours.

{¶ 99} Lastly, Avon Place argues that the trial court's award of litigation expenses in the amount of $95,997.13 was improper because the jury only awarded attorney fees. As a result, Avon Place contends that the trial court had discretion, at most, to award certain costs under Civ.R. 54(D), which permits the award of costs to the prevailing party in civil cases. According to Avon Place, Plaintiffs lacked

supporting documentation for some of their expenses and most of the expenses the trial court awarded were not authorized under Civ.R. 54(D).

{¶ 100} The trial court, however, did not award the litigation expenses under Civ.R. 54(D). Rather, the expenses were part of the punitive-damages award. As Plaintiffs note, this court, in *Caraman v. Bailey*, 2011-Ohio-481 (8th Dist.), previously held that litigation expenses may be awarded as part of punitive damages. We stated:

> The Ohio Supreme Court has held that litigation[ ] expenses may be recovered where there is evidence that the defendant's conduct involved actual malice. *Sorin v. Bd. of Edn.* (1976), 46 Ohio St. 2d 177, 181, 347 N.E.2d 527. In that same vein, courts throughout the state have held that litigation expenses may be awarded as part of punitive damages. *Parrish v. Machlan* (1997), 131 Ohio App.3d 291, 722 N.E.2d 529; *Davis v. Sun Refining & Marketing Co.* (1996), 109 Ohio App.3d 42, 60, 671 N.E.2d 1049; *Chapman v. Mull* (March 10, 1983), Cuyahoga App. No. 45190, 1983 Ohio App. LEXIS 12820 (affirming award of litigation expenses where evidence supported finding of fraudulent conveyance).

*Id.* at ¶ 17.

{¶ 101} Here, the jury found that the employee of defendant acted with actual malice towards Andrews, and therefore it awarded punitive damages. The jury further indicated that Plaintiffs were entitled to recover attorney fees as part of the punitive-damage award. The trial court found that Plaintiffs' expenses were reasonable and justified and "should be fully awarded as an element of punitive damages." (Judgment Entry Ordering Final Judgment, Jan. 13, 2025.) In light of the foregoing, we find that the trial court's award of Plaintiffs' litigation expenses as part of punitive damages was permissible.

{¶ 102} In sum, we do not find that the trial court abused its discretion when it awarded Plaintiffs attorney fees and litigation expenses in excess of $1,000,000. We find that under the circumstances of this case, the hourly rates of Plaintiffs' counsel and the fee bills were reasonable. Furthermore, it was within the court's discretion to modify the fees and the upward modification does not shock the conscience. As the *Bittner* Court stated, "'The trial judge which participated not only in the trial but also in many of the preliminary proceedings leading up to the trial has an infinitely better opportunity to determine the value of services rendered by lawyers who have tried a case before him than does an appellate court.'" *Id.* at 146, quoting *Brooks*, 23 Ohio App.3d 85 at 91 (12th Dist. 1985).

{¶ 103} Accordingly, the fourth assignment of error is overruled.

**E. Prejudgment Interest**

{¶ 104} In the fifth and final assignment of error, Avon Place argues the trial court abused its discretion when it "rubber-stamped" Plaintiffs' request for prejudgment interest under R.C. 1343.03(C). (Avon Place's Brief, pg. 27.) We note that following the court's award, the parties stipulated to $347,409.90 as the amount of prejudgment interest awarded.[12] (Stipulation of Prejudgment Interest Calculation, Feb. 4, 2025.)

{¶ 105} "'[T]he purpose of R.C. 1343.03(C) is to encourage litigants to make a good faith effort to settle their case, thereby conserving legal resources and

---

[12] The parties further agreed that this stipulation does not prejudice Avon Place's right to pursue an appeal.

promoting judicial economy.'" *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St.3d 638, 657-658 (1994), quoting *Peyko v. Frederick*, 25 Ohio St.3d 164, 167 (1986). R.C. 1343.03 was "'enacted to promote settlement efforts, to prevent parties who have engaged in tortious conduct from frivolously delaying the ultimate resolution of cases, and to encourage good faith efforts to settle controversies outside a trial setting.'" *Id.* at 658, quoting *Kalain v. Smith*, 25 Ohio St.3d 157, 159 (1986). The *Moskovitz* Court explained that a party has not failed to make a good-faith effort to settle under R.C. 1343.03(C) if the party

> "has (1) fully cooperated in discovery proceedings, (2) rationally evaluated [the party's] risks and potential liability, (3) not attempted to unnecessarily delay any of the proceedings, and (4) made a good faith monetary settlement offer or responded in good faith to an offer from the other party. If a party has a good faith, objectively reasonable belief that [the party] has no liability, [the party] need not make a monetary settlement offer."

*Id.* at 658-659, quoting *Kalain* at 157.

{¶ 106} "'Prejudgment interest awards are within the sound discretion of the trial court.'" *Soberay v. Greyhound Lines Inc.*, 2019-Ohio-1371, ¶ 135 (8th Dist.), quoting *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 87 (1995). As stated above, an abuse of discretion occurs when a court exercises "its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson*, 2021-Ohio-3304 at ¶ 35.

{¶ 107} Avon Place contends the evidence did not "remotely suggest" that it failed to conduct good-faith negotiations because it participated in two pretrial mediations, where it increased its offers proportionate to Plaintiffs' demands, and

also increased its offer on the first day of trial to $350,000. Avon Place further contends that the fact that the amount awarded after trial was substantially higher than its settlement offers does not equate to it failing to negotiate in good faith.

{¶ 108} In the case before us, the parties agreed to have the issue of prejudgment interest submitted on the briefs, along with affidavits, depositions, exhibits, and trial testimony. The trial court concluded that Plaintiffs were entitled to prejudgment interest on the $1,900,000 compensatory damages award. The court reasoned that Avon Place "failed to rationally [evaluate] their potential liability, failed to make a good faith monetary settlement offer and failed to respond in good faith to settlement demands from the Plaintiffs." (Judgment Entry Ordering Final Judgment, Jan. 13, 2025.) We agree.

{¶ 109} The record demonstrates that Avon Place failed to respond in good faith to Plaintiffs' settlement demands throughout the case. Plaintiffs first issued a settlement demand approximately six months after they filed their complaint. Their initial settlement demand was for $2,500,000. According to Plaintiffs, Avon Place did not issue any response to this demand. Avon Place did not offer a settlement until the first mediation was held at Plaintiffs' request in May 2023, where its initial offer was $25,000.[13] This was approximately 17 months after Plaintiffs' initial settlement demand. The May 2023 mediation failed to resolve the case. The record then reveals that the parties attended a final pretrial where the parties ended with

---

[13] By including the mediation settlement offers and demands in either the lower court pleadings or their respective appellate briefs, the parties have waived their privilege against disclosure of mediation communications.

an $850,000 demand and a $200,000 offer. Approximately one month before trial, the parties attempted to mediate the matter for a second time, at Plaintiffs' request. Again, this mediation failed to resolve the case, with an $800,000 demand and a $225,000 offer. Lastly, on the first day of trial, Plaintiffs reduced their demand to $650,000 and Avon Place increased their offer to $350,000.

{¶ 110} The record further demonstrates that Avon Place failed to rationally evaluate their potential liability. Here, Plaintiffs submitted the deposition of Clara Wukelich, Vice President of Risk Management ("Wukelich"), which was taken after trial. It was Avon Place's position that the weight of Andrews's arm resulted in the trach mask being pulled away from her tracheostomy, which in turn resulted in the gauze being pulled away from the trach cuff. Wukelich testified that she "thought it was more likely than not that it would be a defense verdict[.]" (Wukelich deposition, p. 59.) She stated that their case "was defensible. [Wukelich] thought there was a chance of a verdict related to sympathy, but not that it would be large." (Wukelich deposition, p. 57.)

{¶ 111} The deposition testimony additionally revealed that Wukelich did not arrive at a percentage likelihood of a plaintiff versus defense verdict at trial, explaining the company's conduct by repeatedly stating that she thought that the case was defensible. She believed that the "chance to save [Andrews] had expired during that time that [McCoy] filmed and that, just as the other expert said, if we had more time, maybe it would have been different." (Wukelich deposition, p. 33.) She explained that "if a jury seen the entirety of the video and the time that was lost

by not getting help, that they would understand that we had lost our opportunity to assist [Andrews]." (Wukelich deposition, p. 56.)

**{¶ 112}** Based on the foregoing, it is clear that the trial court did not "rubber-stamp" Plaintiffs' request. Rather, the court based its decision on "the evidence and briefings of the parties[.]" (Judgment Entry Ordering Final Judgment, Jan. 13, 2025.) The trial court was in the best position to determine if Avon Place put forth a good-faith effort to settle the case and found that Avon Place failed to do so. *Soberay*, 2019-Ohio-1371, at ¶ 139 (8th Dist.). The court did not exercise its discretion in an unwarranted way.

**{¶ 113}** Therefore, the fifth assignment of error is overruled.

**{¶ 114}** Accordingly, judgment is affirmed.

It is ordered that appellees recover from appellants costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

EMANUELLA D. GROVES, P.J., and
KATHLEEN ANN KEOUGH, J., CONCUR